UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEUTSCHE ZENTRAL-GENOSSENSCHAFTSBANK AG, NEW YORK BRANCH, d/b/a DZ BANK AG, NEW YORK BRANCH; HSH NORDBANK AG; HSH NORDBANK AG, LUXEMBOURG BRANCH; HSH NORDBANK AG, NEW YORK BRANCH; and HSH NORDBANK SECURITIES S.A., | Case No. 12-cv-04025-VM ECF Case Jury Trial Demanded |
| Plaintiffs, | |
| -against- | |
| HSBC NORTH AMERICA HOLDINGS INC.; HSBC USA INC.; HSBC MARKETS (USA) INC.; HSI ASSET SECURITIZATION CORPORATION; HSBC SECURITIES (USA) INC.; HSBC BANK USA, N.A.; BLAYLOCK & COMPANY INC.; and BLAYLOCK ROBERT VAN LLC, | |
| Defendants. | |

## CONSOLIDATED COMPLAINT

RECEIVED
SEP 17 2012
U.S.D.C. S.D.N.Y.
CASHIERS

Joel H. Bernstein
Mark S. Arisohn
Martis Alex
Corban S. Rhodes
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
(212) 907-0700

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

SUMMARY OF THE ACTION ................................................................................. 1

PARTIES ........................................................................................................... 9

JURISDICTION AND VENUE ............................................................................. 11

FACTUAL ALLEGATIONS ................................................................................. 12

I.      THE SECURITIZATIONS ......................................................................... 12

        A.      The Securitizations At Issue .................................................... 12

        B.      The Securitization Process ....................................................... 14

II.     DEFENDANTS' ROLES IN THE SECURITIZATIONS ............................... 16

        A.      HSBC North America, HSBC USA, and HSBC Markets ............ 16

        B.      HSBC Securities .................................................................... 19

        C.      HASC .................................................................................... 21

        D.      HSBC Bank USA .................................................................... 21

        E.      Blaylock ................................................................................. 22

III.    THE HSBC DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS AND OMISSIONS REGARDING LOAN QUALITY ............ 22

        A.      The HSBC Defendants Made False and Misleading Statements Regarding
                Loan-to-Value Ratios ............................................................. 22

                1.      Statements Regarding Loan-to-Value Ratios ................. 22

                2.      Loan-to-Value Ratio Data Was Materially False ............. 24

                3.      Combined Loan-to-Value Ratio Data Was Materially False ........... 27

        B.      The HSBC Defendants Made False and Misleading Statements Regarding
                Owner-Occupancy ................................................................. 28

                1.      Statements Regarding the Owner-Occupancy Status of the
                        Borrowers ........................................................... 28

                2.      Owner-Occupancy Data Was Materially False ............... 30

C.    The HSBC Defendants Knew That the Representations in the Prospectuses Were False In View of Their Due Diligence of the Loans ................................... 31

IV.    THE HSBC DEFENDANTS' FALSE AND MISLEADING REPRESENTATIONS THAT THE LOANS IN THE POOLS COMPLIED WITH THE UNDERWRITING GUIDELINES OF THE ORIGINATORS ................... 35

A.    Representations in the Offering Documents Concerning the Originator's Adherence to Underwriting Guidelines ................................................................ 35

B.    The Originators' Abandonment of Their Underwriting Guidelines .................... 37

1.    Option One Mortgage Corporation .............................................................. 37

2.    Accredited Home Lenders, Inc. .................................................................. 39

3.    Decision One Mortgage Company, LLC ................................................... 40

4.    WMC Mortgage Corp. ............................................................................... 41

5.    Countrywide Home Loans, Inc. ................................................................. 42

V.    ALTERNATIVELY, DEFENDANTS NEGLIGENTLY MISREPRESENTED THE CREDIT CHARACTERISTICS, UNDERWRITING STANDARDS, AND RATINGS ASSOCIATED WITH THE LOANS UNDERLYING THE TRUST .......... 43

VI.    DEFENDANTS MADE MISLEADING MISSTATEMENTS REGARDING TRANSFER AND ASSIGNMENT OF THE MORTGAGES AND NOTES IN THE TRUSTS ................................................................................................................... 44

A.    Statements Regarding Assignments of Mortgages and Transfer of Notes to the Trusts ................................................................................................... 46

B.    Failure to Timely Transfer Mortgages and Notes Into the Trusts ....................... 48

1.    Failure to Timely Assign Mortgages to the Trusts ................................... 48

2.    Failure to Timely Transfer the Notes to the Trusts ................................... 52

3.    The HSBC Defendants' Knowledge of the Failure to Transfer Notes and Mortgages to the Trusts ........................................................... 53

C.    Material Undisclosed Risks to Investors Resulting From the Failure to Assign the Mortgages and Notes to the Trusts ................................................... 54

1.    Foreclosure and Contractual Remedy Consequences .............................. 54

2.    Tax Consequences ..................................................................................... 55

VII.   ALTERNATIVELY, DEFENDANTS MADE NEGLIGENT MISREPRESENTATIONS CONCERNING THE MORTGAGES AND NOTES UNDERLYING THE SECURITIZATIONS ................................................................... 58

VIII.  PLAINTIFFS AND BLAYLOCK AND (IN THE ALTERNATIVE) HSBC SECURITIES OPERATED UNDER A MUTUAL MISTAKE WITH RESPECT TO THE ASSIGNMENT OF THE MORTGAGES AND NOTES INTO THE TRUSTS ................................................................................................................. 59

IX.    THE ISSUER DEFENDANTS FAILED TO DISCLOSE THAT THEY OBTAINED THE RATINGS OF THE CERTIFICATES THROUGH FALSE REPRESENTATIONS TO THE RATINGS AGENCIES ................................................ 60

X.    PLAINTIFFS REASONABLY RELIED ON DEFENDANTS' MISREPRESENTATIONS IN DECIDING TO PURCHASE THE CERTIFICATES ................................................................................................................... 62

      A.    DZ Bank's Investment Criteria ........................................................................... 62

      B.    HSH Plaintiffs' Investment Criteria .................................................................... 64

      C.    Plaintiffs' Reliance on the Offering Documents was Reasonable ........................ 65

XI.    PLAINTIFFS SUFFERED SIGNIFICANT LOSSES DUE TO DEFENDANTS' MISCONDUCT ...................................................................................................................... 67

PRAYER FOR RELIEF ....................................................................................................................... 75

Plaintiffs Deutsche Zentral-Genossenschaftsbank, New York Branch, d/b/a DZ Bank AG, New York Branch ("DZ Bank") and HSH Nordbank AG, HSH Nordbank AG, New York Branch, HSH Nordbank AG, Luxembourg Branch, HSH Nordbank Securities S.A. (collectively, the "HSH Plaintiffs") (together DZ Bank and the HSH Plaintiffs are "Plaintiffs"), by and through their attorneys, Labaton Sucharow LLP, for their Consolidated Complaint against HSBC North America Holdings Inc., HSBC USA Inc., HSBC Markets (USA) Inc., HSI Asset Securitization Corp., HSBC Securities (USA) Inc., HSBC Bank USA, N.A. (together, the "HSBC Defendants"), Blaylock & Company, and Blaylock Robert Van LLC (collectively, "Defendants"), allege upon personal knowledge as to their own actions, and upon information and belief as to all other matters, based on Congressional records and testimony, governmental and regulatory investigations, news reports, scholarly articles, and investigation of counsel and its agents, as follows:

## SUMMARY OF THE ACTION

1.      This action arises out of the HSBC Defendants' fraud and other misconduct in connection with the offer and sale of certain residential mortgage-backed securities ("RMBS"). In reliance upon the HSBC Defendants' material false statements and omissions, and active concealment of material information, Plaintiffs purchased more than $163 million in Mortgage Loan Pass-Through Certificates (collectively, the "Certificates") in seven RMBS securitizations issued, marketed and sold by the HSBC Defendants:  HASC 2006-OPT1, HASC 2006-OPT2, HASC 2006-OPT3, HASC 2006-HE1, HASC 2006-HE2, HASC 2007-HE1, and HASC 2006-WMC1 (collectively, the "Securitizations").

2.      The Securitizations were purportedly backed by principal and income payment distributions from loan pools (the "Loan Pools") described in the registration statement,

prospectus (the "Prospectus"), prospectus supplement (the "Prospectus Supplement"), registration statement, term sheet and free writing prospectus (collectively, the "Offering Documents"). The Offering Documents were prepared, distributed and filed by the HSBC Defendants for each Trust.

3. The HSBC Defendants knowingly misrepresented the credit quality and characteristics of the Loan Pools, including appraisals of the mortgaged properties and the creditworthiness of the borrowers of those underlying loans. Extensive investigation and analysis by Plaintiffs into a large sample of the individual loans that purportedly comprised each of the Securitizations has revealed that the Offering Documents materially misrepresented the loan-to-value ("LTV") ratios, the combined loan-to-value ("CLTV") ratios, and the rates of owner-occupancy for the various pools of loans purportedly underlying the Securitizations. These are crucial and material metrics that the HSBC Defendants knew and intended that prospective investors would rely upon, and which Plaintiffs did rely upon in making their decision to purchase the Certificates.

4. By reviewing a large sample of loans in the Securitizations from the loan groups that were represented to have backed Plaintiffs' Certificates, and comparing the information revealed by those reviews with the representations made about the loans in the Offering Documents, Plaintiffs' have discovered, using industry-standard Automated Valuation Models ("AVMs"), that the Offering Documents understated LTV for the Trusts by more than 10% in approximately 24% to 44% of the loans. Additionally, approximately 15.5% to 20.1% of the sampled loans in each Securitization were likely not owner-occupied, despite the Offering Documents' representations that they were. These misrepresentations significantly altered the

risk profile of the investments. In the end, Plaintiffs invested in Trusts that were materially different than the Trusts that were represented to them by the HSBC Defendants.

5.     The Offering Documents also falsely represented that the underlying mortgage loans complied with specified underwriting guidelines employed by the loan originators, including with respect to appraisals of the mortgaged properties and the creditworthiness of the borrowers of those underlying loans. These statements were material to Plaintiffs' decisions to invest in the Certificates.

6.     But these representation were false. Among other things, a significant percentage of the purportedly underlying mortgage loans were not originated in accordance with the stated underwriting standards and had materially poorer credit quality than what was represented in the Offering Documents.

7.     There was a widespread and systematic departure from the originators' underwriting guidelines, and the HSBC Defendants were aware of that fact at the time they made the false representations in the Offering Documents that were reasonably relied upon by Plaintiffs and other investors. Among other things, publicly available results of governmental investigations like the Financial Crisis Inquiry Commission ("FCIC"), conducted after the occurrence of the conduct at issue here, have shown that the HSBC Defendants routinely "waived-in" non-conforming loans and included them in the underlying loan pools for their securitizations even though they were expressly advised that such loans did not meet the loan originators' own underwriting guidelines.

8.     In fact, according to data provided by their own due diligence vendor, the HSBC Defendants had the worst waive-in rate of any RMBS issuer on Wall Street. *The HSBC Defendants waived-in an astonishing 62.3% of the loans that they knew did not comply with*

*the specified underwriting guidelines or have compensating factors.* Not only was this undisclosed to investors such as Plaintiffs, but the HSBC Defendants represented exactly the opposite – that all the loans would comply with the originators' underwriting guidelines or have compensating factors.

9.    Based on their due diligence process prior to the issuance of the Certificates, the HSBC Defendants knew or were reckless or negligent in not knowing that large numbers of loans that they securitized and/or sold did not conform to the underwriting guidelines of their originators—including an affiliate of the HSBC Defendants, Decision One Mortgage Company, LLC ("Decision One")—with respect to, *inter alia*, LTV/CLTV ratios and owner-occupancy. The HSBC Defendants included large percentages of these defective and non-conforming loans in the pools purportedly underlying their securitizations, despite knowing from their own due diligence and from third-party vendors that many of the loans failed to comply with such underwriting guidelines, and thereby falsely represented the quality and characteristics to investors, including Plaintiffs.

10.    The HSBC Defendants unambiguously represented in each of the Offering Documents that the securities would be backed by residential mortgage loans, *i.e.*, that they were "residential mortgage-backed securities." The HSBC Defendants represented that the Securitizations would be backed specifically by the loans the credit quality of which the HSBC Defendants touted throughout the Offering Documents. To accomplish this, the Offering Documents drafted by the HSBC Defendants represented that HSI Asset Securitization Corp. ("HASC") was assigning the notes and mortgages purportedly underlying the Securitizations to their respective Trusts to "back" the Securitizations *on or before the closing date* for each Trust. Indeed, without such mortgages, the Trust could not exist, and the entire transaction would be

null and void. However, these representations, too, were false—the Securitizations were not "mortgage-backed," as represented.

11. Plaintiffs commissioned investigations of publicly recorded mortgage documents. Through these investigations Plaintiffs have found that, contrary to the representations in the Offering Documents, the vast majority of the sampled mortgages in the Trusts were not assigned to the Trusts at the time of securitization. In fact, based on mortgage releases granted and filed by or on behalf of the current holder/owner of the notes and mortgages, many of the mortgage loans represented as having been assigned to the Trusts have *never* been assigned to the Trusts. Moreover, many mortgages that were assigned to the Trusts were not assigned until long after the issuance of the Certificates. These mortgage assignment documents also reference a contemporaneous transfer of the promissory notes, which in each of the sampled loans was well after the closing date of the Securitizations, if at all, contrary to the representations in the Offering Documents. The purported transfer of notes and mortgages to the Trusts long after the Securitizations closed means that the mortgage-backed securities the HSBC Defendants represented that they were selling to Plaintiffs were not mortgage-backed at the time of the closing of the Securitization.

12. The HSBC Defendants' failure to timely transfer mortgages to the Trusts exposes Plaintiffs to significant un-bargained-for risks. For example, this failure prevents the Trusts from legally collecting the principal and interest payments from the borrowers. In addition, failure to timely transfer mortgages to the Trusts hinders the Trusts' ability to foreclose on the collateral— *i.e.*, the mortgaged property—in the event of a borrower default. Also, failure to timely transfer these mortgages jeopardizes the crucial Real Estate Mortgage Investment Conduit ("REMIC") tax status of an RMBS trust under the federal tax code, exposing the Trust, and ultimately

investors, to millions of dollars in tax penalties  This failure to timely and properly transfer mortgages to the Trusts resulted in impaired cash flow to the Trusts, lessening the value of the Certificates.

13.     The HSBC Defendants knew or were reckless (or, in the alternative, negligent) in not knowing of the falsity of the representations in the Offering Documents concerning the transfer of notes and mortgages into the Trusts—especially since Defendants failed to properly and timely transfer mortgages and notes into RMBS trusts in their securitizations in prior years. The HSBC Defendants misrepresented and omitted material facts concerning the lack of valid transfer and assignment of notes and mortgages to the Trusts, thus defrauding Plaintiffs into making these investments.

14.     The HSBC Defendants are directly responsible for the misstatements and omissions of material fact contained in the Offering Documents since they prepared, distributed and/or publicly filed them in order to market and sell the Certificates to Plaintiffs and other investors.

15.     HSBC Securities (USA) Inc. ("HSBC Securities"), also knew or was reckless (or in the alternative, negligent) in not knowing that the statements in the Offering Documents concerning LTV and CLTV ratios, owner-occupancy rates, underwriting guidelines, ratings, and the transfer and assignment of notes and mortgages to the Trusts were false because it also reviewed the due diligence reports identifying these inaccuracies.  HSBC Securities is therefore liable for fraud as to these misrepresentations.  Simultaneously, by aiding in the preparation and distribution of the Offering Documents that contained material misrepresentations (known to HSBC Securities), HSBC Securities substantially assisted in the fraud of HASC and HSBC Bank (the "Issuer Defendants") and therefore, aided and abetted the Issuer Defendants' fraud.

16.    Alternatively, if HSBC Securities did not know that the representations in the Offering Documents concerning the transfer and assignment of notes and mortgages to the Trusts were false, then the existence of these mistaken beliefs by both DZ Bank and HSBC Securities represents mutual mistakes of a material fact, and Plaintiffs are thus entitled to rescission of the sale of the Certificates from HSBC Securities.

17.    Likewise, if Blaylock & Company and Blaylock Robert Van LLC (collectively, "Blaylock," and together with HSBC Securities, the "Underwriter Defendants"), as the counterparties to the sale of Certificates to the HSH Plaintiffs, were unaware of the substantial misrepresentations in the Offering Documents, including the fact that the Certificates were not actually mortgage-backed, and therefore, the HSH Plaintiffs are entitled to rescission of their purchase of Certificates from Blaylock.

18.    HSBC North America Holdings Inc., HSBC USA Inc., and HSBC Markets (USA) Inc. are likewise responsible for the misstatements and omissions of material fact contained in the Offering Documents given their direct participation in, and/or dominion and control over, the business operations of the other HSBC Defendants. They are thus liable for fraud, negligent misrepresentation, and aiding and abetting fraud.

19.    The HSBC Defendants' various misrepresentations concerning the characteristics of the Loan Pool underlying the Securitizations, and the transfer of the notes and mortgages to the Trusts, were not only material, but central to Plaintiffs' decision to invest in the Securitizations. Had Plaintiffs known the true quality and characteristics of the loans purportedly underlying the Securitizations and that the notes and mortgages were not properly transferred to the Trusts, Plaintiffs would not have purchased the Certificates.

20.     The HSBC Defendants conducted their due diligence using loan files and other information gathered when they purchased the loans from the originators, none of which was accessible to Plaintiffs prior to their purchase of the Certificates, or at any later time. Plaintiffs could not have discovered, through the exercise of reasonable diligence or ordinary intelligence, the existence of the misrepresentations in the Offering Documents at the time of the purchases. Rather, the matters misrepresented in the Offering Documents were peculiarly within the knowledge of the HSBC Defendants—the entities that purchased, reviewed, and securitized the underlying loans, and that sold the resulting Certificates to investors.

21.     Since the HSBC Defendants had exclusive access to the loan files, they knew that Plaintiffs and other investors were receiving and relying on them to conduct reasonable due diligence. The HSBC Defendants similarly knew that investors, including Plaintiffs, would receive and rely on the representations in the Offering Documents in deciding whether to invest in the Securitizations. Plaintiffs were part of a special group to whom the HSBC Defendants' misrepresentations were directed. The HSBC Defendants targeted the Securitizations to a group of buyers comprised of institutional investors. The Underwriter Defendants solicited Plaintiffs by means of the Offering Documents for the purpose of inducing Plaintiffs to invest in the Securitizations.

22.     Thus, even if the HSBC Defendants did not know that the statements in the Offering Documents were false, alternatively, they negligently misrepresented the LTV and CLTV ratios, owner-occupancy status, underwriting guidelines, ratings of the underlying loans and Certificates and transfer and assignment of the notes and mortgages to the Trusts, without taking basic measures to discover their accuracy.

23. The HSBC Defendants' exclusive and superior knowledge of the true facts regarding the quality of loans in the pools of Securitizations, the originators' lack of adherence to their own underwriting guidelines, and the failure to timely and properly transfer notes and mortgages to the Trusts, together with the HSBC Defendants' knowledge that potential investors such as the Plaintiffs would rely on the representations in the Offering Documents, gave rise to a special relationship between the HSBC Defendants and Plaintiffs in which the HSBC Defendants had a duty to make full and accurate disclosures to Plaintiffs of material matters regarding the Securitizations.

24. Plaintiffs have suffered millions of dollars in losses on their RMBS holdings, as the value of the Certificates at the time of purchase was significantly overstated due to the HSBC Defendants' misrepresentations, resulting in a grossly inflated purchase price. Since the dates of purchase, the value of the Certificates has declined significantly. Plaintiffs therefore seek rescission and/or compensatory damages from Defendants for fraud, fraudulent concealment, aiding and abetting fraud, negligent misrepresentation and mutual mistake.

25. The HSBC Defendants' wanton and reckless misconduct and fraud was part of a pattern of similar conduct in other securitizations they issued and sold, aimed at other investors and the public generally. Plaintiffs are therefore entitled to punitive damages.

## PARTIES

### Plaintiffs

26. Plaintiff Deutsche Zentral-Genossenschaftsbank AG, d/b/a DZ Bank AG, New York Branch, is commercial bank incorporated in Germany, and maintains an office at 609 Fifth Avenue, New York, New York, 10017.

27.     Plaintiff HSH Nordbank AG is a commercial bank incorporated in Germany with twin headquarters in Hamburg and Kiel.

28.     Plaintiff HSH Nordbank AG, New York Branch ("HSH New York") is a division of HSH Nordbank AG, with an office at 230 Park Avenue, New York, New York, 10169.

29.     Plaintiff HSH Nordbank AG, Luxembourg Branch (the "HSH Luxembourg") is a division of HSH Nordbank AG, with a main office at 2 Rue Jean Monnet, 2180 Luxembourg.

30.     Plaintiff HSH Nordbank Securities S.A. ("HSH Securities") is a wholly-owned subsidiary of HSH Nordbank AG, with its principal place of business at 2 Rue Jean Monnet, 2180 Luxembourg.

**Defendants**

31.     Defendant HSBC North America Holdings, Inc. ("HSBC North America") is a Delaware financial holding company headquartered at 452 Fifth Avenue, New York, New York, 10018.  HSBC North America is a subsidiary of HSBC Holdings PLC ("HSBC Holdings").

32.     Defendant HSBC USA Inc. ("HSBC USA") is a Maryland Corporation headquartered at 452 Fifth Avenue, New York, New York, 10018.  HSBC USA is a subsidiary of HSBC North America.

33.     Defendant HSBC Markets (USA) Inc. ("HSBC Markets") is a Delaware Corporation with its principal place of business at 452 Fifth Avenue, New York, New York, 10018.  HSBC Markets is a subsidiary of HSBC North America.

34.     Defendant HSBC Bank USA, N.A. ("HSBC Bank") is a United States bank chartered in Virginia, with its principal place of business at 452 Fifth Avenue, New York, New York, 10018. HSBC Bank is a subsidiary of HSBC USA.

35.     Defendant HSBC Securities (USA) Inc, ("HSBC Securities") is a Delaware Corporation principally located at 452 Fifth Avenue, New York, New York, 10018. HSBC Securities is a subsidiary of HSBC Markets and an indirect wholly owned subsidiary of HSBC USA, HSBC North America, and HSBC Holdings.

36.     Defendant HASC is a Delaware corporation with its principal place of business at 452 Fifth Avenue, New York, New York, 10018. HASC is a direct, wholly owned subsidiary of HSBC Markets and an indirect wholly-owned subsidiary of HSBC USA, HSBC North America, and HSBC Holdings. HASC was the depositor for all the Securitizations at issue in this action. HASC, as the depositor, was also responsible for preparing and filing reports required under the Securities Exchange Act of 1934.

37.     Defendant Blaylock & Company Inc. ("BCI") is or was a Delaware company with its principal place of business at 780 Third Avenue, 44th Floor New York, New York, 10017. BCI is or was a full service investment banking firm that provided underwriting services to national and international clients. BCI merged with Robert Van Securities in 2007 to form Blaylock Robert Van, LLC.

38.     Defendant Blaylock Robert Van, LLC ("BRV"). BRV is a limited liability company organized under the laws of California on March 26, 2007. BRV was formed as a result of a merger between BCI and BRV (together, "Blaylock"). BRV is the successor in interest to BCI.

## JURISDICTION AND VENUE

39.     Plaintiff initiated this case as two separate actions in the Supreme Court of the New York State Court, New York County, captioned *DZ Bank v. HSBC North America Holdings Inc.*, Index No. 650303/2012 (the "DZ Action"), and *HSH Nordbank AG v. HSBC Holdings Inc.*,

Index No. 650539/2012 (the "HSH Action"). The HSBC Defendants removed the DZ Action and the HSH Action to this Court, on May 21, 2012, citing 28 U.S.C. § 1332, diversity jurisdiction, and the Edge Act, 12 U.S.C. § 632, as a grounds for federal subject-matter jurisdiction. The Court has personal jurisdiction over all Defendants by consent, because the transactions from which Plaintiffs' claims arise occurred in this jurisdiction, and/or because Defendants conduct significant business in, and have substantial contacts with, this jurisdiction. By Order of the Court on May 29, 2012 the DZ Action and HSH Action were consolidated under the case caption and docket number above.

40.     Plaintiffs are citizens of foreign states for purposes of diversity jurisdiction.

41.     Venue is proper in this District because a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL ALLEGATIONS

I.     **THE SECURITIZATIONS**

   A.     **The Securitizations At Issue**

   42.     With the exception of HSH Luxembourg, Plaintiffs each purchased each Certificate directly from the Underwriter Defendants as outlined on the Table below. Plaintiff HSH Luxembourg was a subsequent transferee of certain of the Certificates. Plaintiffs continue to hold all of the Certificates, with the exception of HASC 2006-WMC1 (A3), which was sold by DZ Bank at a substantial loss. Plaintiffs each suffered losses as a result of the HSBC Defendants' misrepresentations regarding the Certificates and the Securitizations, and, as a result of those losses, have claims against Defendants.

   43.     The Certificates purchased by Plaintiffs are set forth in Tables 1 and 2, below.

## Table 1 DZ Bank Purchases

| Purchaser | Trust | Tranche | Seller | Date of Purchase | Original Position |
|-----------|-------|---------|--------|------------------|-------------------|
| DZ Bank | HASC 2006-OPT1 | M1 | HSBC Securities | 1/31/2006 | $15,000,000 |
| DZ Bank | HASC 2006-HE2 | 2A3 | HSBC Securities | 11/30/2006 | $23,000,000 |
| DZ Bank | HASC 2006-OPT3 | M1 | HSBC Securities | 3/24/2006 | $7,750,000 |
| DZ Bank | HASC 2007-HE1 | 2A1 | HSBC Securities | 3/6/2007 | $38,725,000 |
| DZ Bank | HASC 2006-WMC1 | A3 | HSBC Securities | 7/31/2006 | $15,000,000 |
| DZ Bank | HASC 2006-HE1 | M2 | HSBC Securities | 10/19/2006 | $9,000,000 |
| DZ Bank | HASC 2006-OPT2 | M1 | HSBC Securities | 2/24/2006 | $14,000,000 |
| | | | | | $122,475,000 |

## Table 2 – HSH Purchases

| Purchaser | Trust | Tranche | Seller | Date of Purchase | Original Position |
|-----------|-------|---------|--------|------------------|-------------------|
| HSH Securities | HASC 2006-OPT2 | M3 | BCI | 2/28/2006 | $1,110,000 |
| HSH Securities | HASC 2006-OPT2 | M4 | BCI | 2/28/2006 | $1,000,000 |
| HSH Securities | HASC 2006-OPT2 | M5 | BCI | 2/28/2006 | $1,675,000 |
| HSH New York | HASC 2006-OPT2 | 2A3 | BCI | 2/28/2006 | $19,000,000 |
| HSH New York | HASC 2006-OPT2 | 2A4 | BCI | 2/28/2006 | $8,916,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| HSH New York | HASC 2006-OPT2 | M2 | BCI | 2/28/2006 | $3,770,000 |
| HSH New York | HASC 2006-OPT2 | M1 | BCI | 2/28/2006 | $5,876,000 |
| | | | | | | $41,347,000 |

## B. The Securitization Process

44.     RMBS securitization is the process by which investment banks pool typically thousands of residential mortgages together in a trust, which then issues securities in the form of certificates to investors. The certificates entitle the holders to a portion of the monthly revenue stream produced by principal and interest payments made by the mortgage borrowers. This monthly revenue stream is overseen and managed by the appointed trustee of each Trust (the "Trustee").

45.     The process begins when a lending institution makes a home loan, secured by a mortgage, to a borrower. The lender, also known as the "originator," then sells such loans, typically in bulk, to a separate securitizing entity, typically an affiliate of the investment bank arranging the securitization, called the "sponsor" or "seller." The sponsor or seller in turn sells the loans to the "depositor," typically also an affiliate of the same investment bank. Both the sponsor and depositor are considered an "issuer" of the securities.

46.     When the issuer purchases loans from an originator, the issuer gains access to all of the "loan files," which contain the underlying documentation that the borrower submitted in connection with his/ her loan application, together with any additional information, such as appraisals and credit assessments. Plaintiffs and other investors did not have access to the loan files, prior to, at, or subsequent to the time of their purchase.

47.     The issuer conducts a due diligence review of the loan files associated with the pool of mortgages it is purchasing to ensure that the loans were made in accordance with the stated underwriting guidelines of the originator. Typically, the issuer conducts the review through a third-party vendor, such as Clayton Holdings, LLC ("Clayton") which reviewed loans for HSBC-issued securitizations. The third-party review of the loan files includes verification of, *inter alia*, the reported appraisal value of the home, the primary residence of the borrower, the borrower's debt-to-income ratio, the loan documentation level and other data points.

48.     The purpose of this due diligence review is to ensure that the loan pool was originated in compliance with the originator's stated underwriting guidelines. After its review, the due diligence vendor provides the issuer with a report summarizing the pool of loans that it reviewed and advises the issuer which loans complied with underwriting guidelines and which have failed. The Offering Documents represent that any loan which does not comply with the stated underwriting guidelines cannot and will not be included in the securitized loan pool unless it is specifically found to have certain compensating factors.

49.     Based on the results of the due diligence review, the issuer determines which loans to include in the mortgage pools for each securitization and prepares offering documents describing the characteristics of the securitized loans. As discussed in greater detail below, the issuer makes representations to investors in the offering documents concerning, among other things, LTV or CLTV ratios of the mortgages, the owner-occupancy status of the mortgaged properties, the originators' adherence to underwriting guidelines, and the fact that the notes and mortgages are to be assigned to the trusts on or before the closing date. The results of the due diligence review itself, however, are not included in the offering documents and are therefore not available to investors like Plaintiffs.

50.    According to the offering documents, once the due diligence review is complete, and prior to the issuance of the certificates, the depositor must "deposit" all of the loans into the trust by transferring and assigning each of the notes and mortgages to the trust in accordance with all applicable state and local laws.

51.    The trust then issues certificates of varying seniority, called "tranches," which entitle the certificate-holder to receive a portion of the principal and interest payments that the borrowers make on their mortgage loans.  In the event that a borrower defaults on his or her loan obligation, the trust is entitled to foreclose on the property, and distribute the sale proceeds to certificate-holders according to the priority specified in the offering documents.

52.    The certificates are initially allocated to one or more underwriters, which identify potential investors, market the certificates to those investors based on the offering documents, and ultimately sell the certificates to them.

## II.    DEFENDANTS' ROLES IN THE SECURITIZATIONS

53.    Each Defendant participated in the securitization process for the Certificates at issue, as follows:

### A.    HSBC North America, HSBC USA, and HSBC Markets

54.    HSBC North America, HSBC USA, and HSBC Markets (together, the "Parent Defendants") are each wholly-owned subsidiaries of the global parent, HSBC Holdings, and together, the Parent Defendants oversaw and controlled the RMBS operations of the remaining HSBC Defendants.

55.    HSBC North America actively engages in the origination, purchase, sale, and securitization of mortgage related assets. Through its various subsidiaries, including HSBC Bank and HSBC Securities and HASC, HSBC North America offers a wide variety of mortgage products with a diverse range of credit profiles including non-prime and non-conforming loans.

HSBC Markets operates as a holding company for global banking and market subsidiaries including Defendants HSBC Securities and HASC. In or around the time of the Securitizations, HSBC Bank comprised approximately 98% of the consolidated assets of HSBC USA, an indirectly-held, wholly-owned subsidiary of HSBC North America Holdings Inc.

56. There was substantial overlap in the management teams and between controlling persons and senior managers of the Parent Defendants and the other HSBC Defendants during the relevant time period. For example:

- Paul J. Lawrence currently serves as President of HSBC USA. Mr. Lawrence also serves as Head of Group Audit for the global parent HSBC Holdings. He has held the title of Group General Manager at HSBC Holdings since August 1, 2005. Mr. Lawrence served as Chief Executive Officer and President of HSBC Bank USA since February 22, 2007.

- Michael Francis Geoghegan served as the Group Chief Executive Officer of HSBC USA since May 2006, a title also he holds at HSBC Holdings. He has held the position of Director at HSBC North America, as well as Group Chief Executive of HSBC Holdings from May 26, 2006 to December 31, 2010.

- Anthony J. Murphy served as Senior Executive Vice President of Strategy Implementation at HSBC North America Holdings, Inc. Mr. Murphy was also the Principal of HSBC Markets (USA) Inc., the President of HSBC Securities (USA), Inc., and the Head of Global Banking at HSBC Bank USA, N.A.

- Andrea Lenox was a Senior Vice President at HSBC Securities from July 2005 to February 2008. Ms. Lenox was also a Vice President at HASC and certified SEC 8-K reports for all trusts in this action.

- Jon Voigtman was a Managing Director of HSBC Securities from February 2005 to June 2007. During this time, he was also a Managing Director of HASC.

- Todd White was co-head of RMBS at HSBC Securities until February 2008, during which time he was also a Director at HASC.

57. The closely interconnected relationships between the Parent Defendants and the other HSBC Defendants can be seen in the following Table:

**Table 3**

| | HSBC NORTH AMERICA | HSBC USA | HSBC MARKETS | HASC | HSBC SECURITIES | HSBC BANK |
|---|---|---|---|---|---|---|
| Paul J. Lawrence | | President and Chief Executive Officer | | | | Chief Executive Officer and President |
| Michael Francis Geoghegan | Director | Group Chief Executive Officer | | | | Chairman |
| Andrea Lenox | | | | Vice President | Senior Vice President | |
| Jon Voigtman | | | | Managing Director | Managing Director | |
| Todd White | | | | Director | Co-Head of RMBS | |
| Anthony J. Murphy | Senior Executive Vice President of Strategy Implementation; formerly Head of Portfolio Management | | Principal | | President, Chief Executive Officer | Executive Officer; Head of Global Banking |

58.     The overlapping and interconnected nature of the directorships, officerships, and executive positions among the HSBC Defendants enabled the Parent Defendants to control and dominate the entire RMBS securitization business and thereby increase overall revenues. The Parent Defendants treated their securitization activities as an integrated whole, using the other subsidiary HSBC Defendants as instrumentalities of their scheme. As such, the HSBC Defendants are jointly and severally liable for the misrepresentations and omissions in the Offering Documents.

59.     Each of the HSBC Defendants participated in the structuring, arranging, modeling, pricing and/or sale of the Certificates at issue here. As discussed above, an essential part of this process is the acquisition of mortgages and the timely transfer to a trust that is created to hold the pool of mortgage loans and to issue the certificates backed by those loans. The

HSBC Defendants were also responsible for underwriting the offering of the Certificates and marketing and selling the Certificates to investors, including Plaintiffs. Accordingly, each HSBC Defendant is jointly and severally liable for the misstatements and omissions of material fact alleged herein.

60.     The Parent Defendants utilized their subsidiaries at every stage of the securitization process to assemble, market, and derive income from the Securitizations, the interests in which the Parent Defendants knew or should have known its subsidiaries were selling to investors on the basis of material misrepresentations. The relevant entities for each of the Securitizations are set forth in Table 4 below.

**Table 4**

| Trust Name | Depositor | Sponsor | Underwriter/ Counterparty |
|------------|-----------|---------|---------------------------|
| HASC 2006-OPT3 | HASC | HSBC Bank USA | HSBC Securities |
| HASC 2006-OPT1 | HASC | HSBC Bank USA | HSBC Securities |
| HASC 2007-HE1 | HASC | HSBC Bank USA | HSBC Securities |
| HASC 2006-HE2 | HASC | HSBC Bank USA | HSBC Securities |
| HASC 2006-HE1 | HASC | HSBC Bank USA | HSBC Securities |
| HASC 2006-WMC1 | HASC | HSBC Bank USA | HSBC Securities |
| HASC 2006-OPT2 | HASC | HSBC Bank USA | HSBC Securities and Blaylock |

**B.      HSBC Securities**

61.     Defendant HSBC Securities was the lead underwriter for each of the Securitizations. In that capacity, HSBC Securities was responsible for underwriting the sale of the Certificates and managing their offering to investors, including Plaintiffs. HSBC Securities sold all of the Certificates to Plaintiff DZ Bank. HSBC Securities collected fees and earned profits for its role in the Securitizations.

62.     HSBC Securities' participation in the marketing of the Securitizations was an essential component of the sale of the Certificates to Plaintiffs, and contributed directly to the other HSBC Defendants' wrongdoing and to Plaintiffs' losses. HSBC Securities, together with the Parent Defendants, provided the prime impetus for each of the Securitizations. HSBC Securities received substantial fees in connection with the Securitizations and sought to increase its volume of Securitizations in order to generate more underwriting fees and to gain a larger share of the RMBS securitization market. By disregarding underwriting failures and allowing the Issuer Defendants to buy and "waive in" non-conforming, defective loans, HSBC Securities was able to generate more fees at the expense of its customers, including DZ Bank.

63.     Due to substantial overlap in management, personnel and other resources, HSBC Securities was aware of and/or actively participated in the "waiving in" of loans by the Issuer Defendants, such that it knew the loans were not originated in accordance with stated loan underwriting guidelines into the purportedly underlying loan pools. Moreover, HSBC Securities was aware that certain information regarding loan conformity to origination guidelines and the transfer of notes and mortgages to the Trusts was materially false and is directly responsible for the misrepresentations in the Offering Documents relating thereto. HSBC Securities nevertheless sold the Certificates to DZ Bank in order to generate significant fees for itself. HSBC Securities provided the Offering Documents, which contained material misrepresentations, to DZ Bank for the purpose of soliciting its investments. HSBC Securities also sent the Offering Documents to DZ Bank and was the counterparty to the contracts of sale for each of the Certificates it sold to DZ Bank, which relied on the Offering Documents in making its investment decision.

### C.   HASC

64.    Defendant HASC was the depositor for each of the Securitizations.  As depositor, HASC was responsible for purchasing the underlying mortgage loans, and for transferring, selling or otherwise conveying the mortgage loans to the Trusts.

65.    HASC was also responsible for forming the issuing trusts that purportedly held the mortgage loans for the benefit of the certificate-holders, and for preparing and filing with the U.S. Securities and Exchange Commission ("SEC") the Offering Documents pursuant to which the Certificates were offered.  HASC collected fees and earned profits for its role in the Securitizations.  The Offering Documents state that HASC has no business operations other than securitizing mortgage assets and related activities.

### D.   HSBC Bank USA

66.    Defendant HSBC Bank USA was the sponsor of each of the Trusts.  As sponsor, HSBC Bank USA was responsible for purchasing the loans from the originators of the Trusts— and then selling them to the Depositor Defendant, HASC, to be deposited into the Trusts.  HSBC Bank USA has no business operations other than securitizing mortgage assets and related activities.

67.    HSBC Bank USA, together with HASC, was an issuer of each of the Certificates and was responsible for preparing and filing with the SEC the Offering Documents for these Securitizations with the SEC.  Together, the Issuer Defendants, HSBC Bank and HASC, were responsible for the statements in the respective Offering Documents and the due diligence of the underlying loans they purchased from the originators and purportedly included in their respective Securitizations.

### E. Blaylock

68.     Blaylock was a co-underwriter of the HASC 2006-OPT2 Securitization along with HSBC Securities, and was the counterparty that sold the HSH Plaintiffs their Certificates.

## III. THE HSBC DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS REGARDING LOAN QUALITY

### A. The HSBC Defendants Made False and Misleading Statements Regarding Loan-to-Value Ratios[1]

#### 1. Statements Regarding Loan-to-Value Ratios

69.     The Offering Documents for the Securitizations reported information regarding the credit quality of the pooled mortgage loans. One particularly important piece of data is the LTV ratio.[2] LTV ratio is a material metric indicative of the quality of the pooled mortgage loans which is provided in the Prospectus Supplements for the Trusts. Generally, an LTV ratio is the ratio of the principal balance of the first mortgage lien on a mortgaged property to the appraised value of the mortgaged property. The LTV ratio in the Offering Documents is provided on a weighted average basis, meaning that the HSBC Defendants weighted the LTV ratio of each loan in the pool according to the size of the loan in relation to the aggregate principal balance of the entire loan pool.

70.     LTV ratios are material to prospective RMBS investors because they are among the strongest predictors of default risk for the loans underpinning the securitizations. Lower LTV ratios mean that the borrowers have more of their own equity in the properties, which decreases the likelihood that they will default or simply stop paying the mortgages if the properties decline in value. Furthermore, in cases of a default, a higher amount of equity can

---

[1] A list of the false and misleading statements included in the Offering Documents is attached at Appendix A.

[2] Unless otherwise indicated, all figures presented in this Consolidated Complaint concerning LTV and CLTV ratios and Owner-Occupancy rates are on a weighted average basis according to the principal balance of the underlying loans at issue, which is how they were represented in the Offering Documents.

lessen the severity of a loss by potentially permitting a higher recovery from a foreclosure. Therefore, the loss severity, *i.e.*, the magnitude of losses, that a trust suffers resulting from a default by a borrower is generally lower if the LTV ratio is lower.

71.     With regard to default risk, an LTV ratio over 100% means that the outstanding amount of the mortgage loan(s) is higher than the value of the property, and thus the holder of the note is likely to suffer a loss in the event of default.  Conversely, a lower LTV ratio implies that the borrower has equity in the property, in which case the borrower has more incentive to keep the loan current so as not to default and lose the equity in the property during foreclosure. Therefore, as compared to a borrower whose mortgage has an LTV ratio of 100% or more and thus no equity in the property, a borrower who has a mortgage with a LTV ratio of 80% has 20% of his or her own equity invested in the house, and is much less likely to default and risk foreclosure since he may stand to lose the appraised 20% remaining equity value in the property.

72.     A lower LTV ratio also means that the trust has more valuable collateral to protect against borrower default, lowering the loss severity to the trust in such circumstances.  For example, if a loan has an LTV of 100%, the trust must bear the entire cost of the foreclosure process, including legal fees, real estate fees, taxes, foregone interest, late charges, plus any loss taken on the sale of a property with a decreased value.  A loan with an LTV of 80%, however, provides a 20% cushion to cover such losses.  Where the trust bears such costs, these costs reduce the amount of funds that would otherwise be available to make regular payments to investors in the securitization.

73.     The Offering Documents misrepresented the LTV ratios for the mortgages purportedly in the pools underlying the Securitizations because they used inflated appraisal values for the mortgaged properties.

74.     Accurate appraisals are crucial to the accuracy of LTV ratios, since the value of the property is the denominator of the LTV ratio. An inflated appraisal, therefore, generally results in an LTV ratio that understates the credit risk of the loan.

75.     Plaintiffs' loan level investigation and analysis have revealed that the appraisal value of a large number of loans was materially inflated in each of the Securitizations, causing the LTV ratios to be understated. As described below, many of the originators deliberately inflated their appraisals in order to achieve the target LTV ratios required by the HSBC Defendants for the loan pools in the Securitization, and the HSBC Defendants were aware of these inflated appraisals based on their own due diligence and due diligence done for them by third-party vendors engaged for that purpose.

### 2.     Loan-to-Value Ratio Data Was Materially False

76.     Plaintiffs directed a review of loan-level data for the purportedly pooled mortgages in each of the Trusts to determine whether the HSBC Defendants' representations concerning LTV ratios were correct and accurate. They were not. The HSBC Defendants understated the LTV, thus understating both the probability of default and the loss severity upon default of the loans purportedly underlying the Securitizations.

77.     As described below, the originators deliberately inflated their appraisals for the properties in order to achieve the target LTV ratios that the HSBC Defendants sought. The HSBC Defendants were aware of the inflated appraisals and did not believe them to be correct at the time they were issued based on their own due diligence and because the HSBC Defendants knew that the data underlying the appraisals was false.

78.     Plaintiffs commissioned the use of an AVM to determine the value of the underlying properties at the time the pooled loans were originated. AVMs rely on similar data as do appraisers: primarily county assessor records, tax rolls, and information about comparable

property sales to determine property values. AVMs are a routinely used and widely accepted method of determining property value. Plaintiffs used an industry-standard AVM that is regularly used to determine property values by 18 of the top 20 mortgage lenders in the United States, as well as by brokers, government agencies, marketing firms, consumers and insurance companies.

79.    Plaintiffs' investigation involved the application of AVMs to a large sampling of more than 2,300 loans from the Loan Pools to determine the value of the underlying properties at the time the pooled loans were originated. The results of Plaintiffs' loan-level investigation into the true LTV ratios of the mortgages underlying the Certificates are reflected in Table 5 below:

**Table 5**

| Trust | Sample Size | Reported LTV over 100% | Actual LTV over 100% based on the AVM | Reported Weighted Avg. LTV | Percentage points by which Weighted Avg. LTV was Understated in the Offering Documents based on the Sample | Percentage of Loans Sampled where the Offering Documents Understated LTV by more than 10 Percentage Points |
|---|---|---|---|---|---|---|
| HASC 2006-OPT1 | 294 | 0% (Pro. Supp. at S-3, A-7) | 22.4% | 79.34% (Pro. Supp. S-3, A-7) | 8.7 | 36% |
| HASC 2006-HE2 | 379 | 0% (Pro. Supp. at S-4, S-28, A-7-8) | 22.0% | 81.64% (Pro. Supp. S-39) | 11.2 | 29% |
| HASC 2006-OPT3 | 312 | 0% (Pro. Supp. at S-4, S-25) | 23.6% | 79.29% (Pro. Supp. S-4, S-32) | 9 | 32% |
| HASC 2007-HE1 | 312 | 0% (Pro. Supp. at S-4, S-27, A-7) | 42.6% | 84.23% (Pro. Supp. A-53) | 13.1 | 44% |
| HASC 2006-WMC1 | 364 | 0% (Pro. Supp. at S-4, S-24) | 19.6% | 82.16% (Pro. Supp. S-4, S-33, A-7) | 8.7 | 27% |
| HASC 2006-HE1 | 367 | 0% (Pro. Supp. at S-28, A-8) | 18.4% | 79.81% (Pro. Supp. A-8) | 9.3 | 34% |
| HASC 2006-OPT2 | 275 | 0% (Pro. Supp. at S-24, A-7) | 20.5% | 79.31% (Pro. Supp. S-4, A-7) | 6.5 | 24% |

80.    This data shows that the appraised values reported in the Offering documents for the properties supposedly comprising the Loan Pools were significantly higher than the actual property values. The failure to accurately appraise these properties led to a material understatement of the LTV ratios and a corresponding understatement of the investment risk. The results demonstrate at least three ways in which the Offering Documents significantly understated the LTV ratios.

81.    First, the Offering Documents understated the LTV ratios by misrepresenting the maximum acceptable LTV ratio for loans included in each of the Trusts. For each of the Trusts, the Offering Documents represented that *no* mortgage in the Trusts had loans with an LTV ratio more than 100%. (*See* Table 5.) In reality, *between 18.4% and 42.6% of the sampled loans for each Trust had LTV ratios over 100%*. Every one of the Securitizations included a significant number of loans that were over 100% LTV, despite representations in the Offering Documents to the contrary. Such "under water" mortgages are far more likely to default and cause losses to the Trust.

82.    Second, the Offering Documents understated the weighted average LTV ratio for the entire pool of loans in each of the Trusts. Each of these misrepresentations materially understated the degree of credit risk associated with the underlying loan pool. The Offering Documents reported appraised values for the properties supposedly securing the loans pooled into the Trusts that were significantly higher than their actual values, as shown by the weighted average LTV analysis. For each Trust, the actual weighted average LTV **was** *between 6.5 and 13.1 percentage points higher* than reported in the Offering Document, based on the samples.

83.    Third, the data also demonstrates the severity of the LTV understatement in the Offering Documents. Between *24% and 44% of the loans sampled were misrepresented by*

*more than 10%* in each of the Trusts. These overstatements led to a material understatement of the LTV ratios, and a corresponding understatement of the investment risk.

84.     In sum, the representations in the Offering Documents about LTV ratios were demonstrably false with the effect of materially understating the credit risk of the Certificates. Plaintiffs relied on the HSBC Defendants' representations in the Offering Documents to accurately portray the LTV characteristics of the pool, because Plaintiffs did not have access to the information necessary to independently verify those figures at the time Plaintiffs purchased the Certificates.

### 3.     Combined Loan-to-Value Ratio Data Was Materially False

85.     Another material piece of information provided in the Prospectus Supplements for the Securitizations indicative of the quality of the pooled mortgage loans was the CLTV ratio. A CLTV ratio is, generally, the ratio of the combined principal balance of *all* mortgage liens on the mortgaged property to the value of the mortgaged property. This provides a more complete picture of the borrower's total debt burden compared to collateral value than the LTV ratio alone.

86.     The HSBC Defendants represented the weighted average CLTV for the Trusts as being between 82.74% and 92.77% in the respective Offering Documents. In fact, with the sole exception of HASC 2006-HE1, these representations understated the actual weighted average CLTV ratio at the time they were made by between 7.6 and 13.9 percentage points, as set forth in Table 6 below, based on Plaintiffs' analysis of more than 1900 sampled loans from the Loan Pools. This substantial understatement of the CLTV ratios associated with the loan pools underlying the Trusts materially misrepresented the true credit risk of the Certificates that Plaintiffs purchased from those Securitizations. Indeed, the likelihood of default was actually much higher than indicated by the CLTV ratio numbers disclosed in the Prospectus Supplements. The HSBC Defendants' misrepresentations related to CLTV ratios are shown in Table 6:

**Table 6**

| Trust | Sample Size | Reported CLTV over 100% | Actual CLTV over 100% based on the AVM | Reported Weighted Avg. CLTV | Percentage points by which Weighted Avg. CLTV was Understated in the Offering Documents based on the Sample | Percentage of Loans Sampled where the Offering Documents Understated CLTV by more than 10 Percentage Points |
|---|---|---|---|---|---|---|
| HASC 2006-OPT1 | 294 | 0% (Pro. Supp. at S-3, A-8) | 32.0% | 82.94% (Pro. Supp. S-3, A-8) | 8.5 | 40% |
| HASC 2006-HE2 | 379 | 0% (Pro. Supp. S-28, A-8) | 56.5% | 91.73% (Pro. Supp. S-39) | 12.9 | 43% |
| HASC 2006-OPT3 | 312 | 0% (Pro. Supp. at S-4, S-25) | 32.7% | 82.25% (Pro. Supp. S-4, S-32) | 9.2 | 38% |
| HASC 2007-HE1 | 312 | 0% (Pro. Supp. at S-4, S-27, A-8) | 61.0% | 88.27% (Pro. Supp. A-54) | 13.9 | 50% |
| HASC 2006-WMC1 | 364 | 0% (Pro. Supp. At S-4, S-24) | 61.6% | 92.77% (Pro. Supp. S-4, S-33, A-8) | 10.6 | 41% |
| HASC 2006-OPT2 | 275 | 0% (Pro. Supp. at S-24, A-8) | 37.7% | 82.74% (Pro. Supp. S-4, A-8) | 7.6 | 33% |

**B.      The HSBC Defendants Made False and Misleading Statements Regarding Owner-Occupancy**

**1.      Statements Regarding the Owner-Occupancy Status of the Borrowers**

87.      Another material piece of information provided in the Offering Documents for the Securitizations indicative of the quality of the pooled mortgage loans was "owner-occupancy status" of the mortgage borrowers. Owner-occupancy status refers to the residency of the borrower, that is, whether the borrower is living in the respective mortgaged property or whether the property is a second home, or a vacation or investment property. A loan to a borrower who uses the mortgaged property as a primary residence is generally referred to as an "owner-occupied" loan. This information is material to an investor's assessment of the credit risk, because a property's occupancy status affects the credit risk of the loan.

88.     As several studies have confirmed, borrowers who actually live in the homes secured by mortgages are significantly less likely to default on their loan obligations than borrowers with mortgages on second homes, vacation homes or investment properties. In fact, a study conducted by Equifax Inc. concluded that non-owner-occupied loans were nearly *twice* as likely to be in default 12 months after origination as owner-occupied loans. *See* Equifax Capital Markets Media Primer, at 1 (Mar. 25, 2010), available at www.equifax.com/PR/pdfs/012910CMDataPrimer.pdf. A separate study, conducted by Fitch Ratings, concluded that second homes have at least a 10% higher rate of default than primary residences, while investment properties have at least a 35% higher rate of default. *See* Fitch Ratings, Structured Finance, "Resilogic: U.S. Residential Loss Model Criteria" (Aug. 12, 2011).

89.     Overall, the higher the percentage of loans that are not owner-occupied in a securitization, the greater the risk of loss to investors. As with LTV and CLTV, even a small inaccuracy in the percentage of owner-occupied properties is crucial to investors as those small differences significantly impact the overall risk of the Securitization. Inaccuracies in owner-occupancy rates also directly affect the ratings given to the Certificates, and particularly when combined with misstated LTV and/or CLTV ratios the inaccuracies result in significantly higher cumulative loss estimates for the collateral pools.

90.     For each of the Securitizations, the Offering Documents materially overstated the percentage of loans that were owner-occupied, and thus materially understated the Certificates' degree of risk. The representations concerning owner-occupancy rates made in the Offering Documents for the Securitizations are shown in Table 7, *infra*.

### 2. Owner-Occupancy Data Was Materially False

91.     Plaintiffs conducted a review of loan-level data for a sample of the pooled mortgages in these Securitizations to determine whether data on owner-occupancy rates contained in the Offering Documents were accurate. The owner-occupancy data was false.

92.     Plaintiffs sampled more than a combined 2,400 loans from the Trusts. The number of owner-occupied properties collateralizing the Securitizations was, in fact, significantly lower than represented.

93.     Plaintiffs' investigation into the occupancy status of the reviewed loans involved looking at the borrowers' contemporary credit history, *i.e.*, whether creditors were reporting the securitized property's address as the borrower's mailing address six months after the origination of the mortgage.

94.     Six months provides ample time for a borrower to notify creditors of his or her new address. If the securitized property does not appear anywhere in the borrower's credit history in the six months after the securitized mortgage was originated, this is a strong indication that the property was not, in fact, the borrower's primary residence.

95.     Far fewer properties were owner-occupied than the HSBC Defendants reported in the Offering Documents. For the Trusts, the actual owner-occupancy rate of the sampled loans for the Trusts was *15.6% to 19.7% less than represented in the Offering Documents*, as shown in Table 7:

**Table 7**

| Trust | Represented Owner-Occupied Percentage | Percentage of Reported Owner-Occupied Loans Sampled Not on Borrower's Credit History After 6 Months | Percentage by which Owner-Occupancy was Overstated Based on the Sample |
|---|---|---|---|
| HASC 2006-OPT1 | 89.9%[3] (Pro. Supp. at A-17) | 21.4% | 19.2% |
| HASC 2006-HE2 | 97.2% (Pro. Supp. at A-63) | 18.7% | 18.2% |
| HASC 2006-OPT3 | 92.5% (Pro. Supp. at A-17) | 18.4% | 17.0% |
| HASC 2006-OPT2 | 93.6% (Pro. Supp. at A-18) | 16.7% | 15.6% |
| HASC 2007-HE1 | 94.5% (Pro. Supp. at A-63) | 18.8% | 17.8% |
| HASC 2006-WMC1 | 96.0% (Pro. Supp. at A-17) | 17.2% | 16.5% |
| HASC 2006-HE1 | 96.6% (Pro. Supp. at A-17) | 21.1% | 19.7% |

96.     It is reasonable to infer that the Offering Documents significantly misstated the rate of owner-occupancy, a highly material credit risk metric, based on Plaintiffs' samples from each of the Trusts. Because the HSBC Defendants had access to the loan files, they could have easily verified the owner-occupancy status of the properties.

### C.     The HSBC Defendants Knew That the Representations in the Prospectuses Were False In View of Their Due Diligence of the Loans

97.     The HSBC Defendants used third-party vendors, like Clayton or similar companies to perform due diligence on the pools of mortgages that purportedly went into their RMBS Securitizations.

98.     According to an extensive investigation and report by the congressional FCIC, during 2006, when the HSBC Defendants issued and sold the Certificates to Plaintiffs, the HSBC Defendants engaged Clayton to perform due diligence on the pools of mortgages that went into

---

[3] When available, the "Represented Owner-Occupied Percentage" is provided for the loan group associated with the tranche that Plaintiffs purchased.

its RMBS securitizations. During this period, Clayton was the largest third-party provider of due diligence services on RMBS securitizations, with between 50% and 70% market share according to evidence presented to the FCIC. Specifically, during the period from 2006 through mid-2007, Clayton reviewed the loan files for more than 27,000 loans for the HSBC Defendants. *See* Clayton Holdings LLC, All Clayton Trending Report: 1st Quarter 2006 - 2nd Quarter 2007 (2007) ("Clayton Report").

99. The purpose of this due diligence process was to determine whether the loans to be included in the Securitizations complied with the stated underwriting guidelines of the originators. This process scrutinized many aspects of the originator's guidelines, including LTV ratios and owner-occupancy rates. Once completed, Clayton provided detailed reports to the HSBC Defendants containing the scores of the reviewed loans prior to, and during the preparation of the Offering Documents.

100. Clayton scored each loan it reviewed on a scale of 1 to 3. A score of "1" meant that the loan complied with the underwriting guidelines of the originator. A score of "2" meant that the loan did not comply with the originator's underwriting guidelines, but had one or more compensating factors. A score of "3" meant that the loan both failed to comply with the originator's underwriting guidelines and failed to possess any compensating factors.

101. On average, approximately 26.8% of the loan files Clayton reviewed for the HSBC Defendants during this time received a failing score of "3"—meaning that these loans *neither* complied with the originators' underwriting guidelines *nor had* compensating factors.

102. Because Clayton gave the HSBC Defendants detailed reports of these scores, the HSBC Defendants knew when they were preparing the Offering Documents for their RMBS securitizations that, on average, approximately 26.8% of the loans reviewed by Clayton failed to

comply with the underwriting guidelines of the originators and were without any compensating factors.

103. Nevertheless, based on the data provided in the Clayton report, ***the HSBC Defendants "waived in" 62.3% of the loans Clayton had reviewed and rejected*** and ultimately included them in the RMBS sold to investors, according to the Clayton Report. *See* Clayton Report at 6. In fact, the HSBC Defendants had the single worst waive-in rate out of all 23 RMBS issuers that Clayton worked with, and more than twice the average waive-in rate of all the others. In short, the HSBC Defendants knew—whereas Plaintiffs did not—that a significant percentage of the loans purportedly included in their RMBS was unacceptable by the originators' own standards, but included the non-compliant loans in the Securitizations anyway, misrepresenting their credit quality in the Offering Documents.

104. Moreover, according to the FCIC Report, RMBS issuers consistently used the existence of underwriting exceptions to negotiate discounts for themselves when purchasing bulk loans from originators. However, this was not disclosed to the investors, who were instead told that all the loans in the securitization met the underwriting guidelines or had compensating factors. Plaintiffs have no reason to believe that the HSBC Defendants deviated from this industry-wide practice.

105. "Waiving in" loans that failed to meet such criteria as the stated LTV, CLTV and owner-occupancy standards for underwriting has obvious adverse effects on investors. In this case, it adversely affected the Trusts' cash flow and greatly increased the Trusts' collateral losses, and thereby the performance on the Certificates, because the loans had a materially greater risk of default than the Offering Documents represented. It also dramatically inflated the price that Plaintiffs paid for the Certificates, which would have been far less had the collateral

characteristics been described accurately. Given this, the HSBC Defendants, at the very least, had a duty to disclose the fact that they had a practice of waiving-in loans that did not comply with the originators' underwriting criteria, as that criteria was represented in the Offering Documents, but instead they concealed that information.

106.    Moreover, even though the HSBC Defendants were on notice that approximately 26.8 % of the loans Clayton sampled did not comply with underwriting guidelines or possess compensating factors, the HSBC Defendants failed to conduct any additional review of the loans that had not been sampled. In other words, despite knowing that the un-sampled set would contain approximately the same proportion of bad loans (as such is the purpose of sampling), the HSBC Defendants ignored this obvious defect, and instead, without further due diligence placed all of the un-sampled loans into securitizations, as well.

107.    Then, after knowingly waiving in loans that violated underwriting guidelines and had no compensating factors, the HSBC Defendants nevertheless told investors, including Plaintiffs, that the exact opposite was true. The HSBC Defendants represented in the Offering Documents that all the loans in the mortgage pool either complied with the underwriting guidelines or had compensating factors, even though they knew this was plainly false.

108.    Moreover, the HSBC Defendants had a special relationship with at least one of the originators – Decision One was a wholly-owned subsidiary of HSBC Holdings. The HSBC Defendants therefore had full and unfettered access to documents and information about the poor credit quality and systematic underwriting deviation described below. (*See infra* at Section IV. B.)

IV. **THE HSBC DEFENDANTS' FALSE AND MISLEADING REPRESENTATIONS THAT THE LOANS IN THE POOLS COMPLIED WITH THE UNDERWRITING GUIDELINES OF THE ORIGINATORS**

A. **Representations in the Offering Documents Concerning the Originator's Adherence to Underwriting Guidelines**

109.    In addition to relying on specific representations about loan and credit criteria in the Offering Documents, Plaintiffs relied on the HSBC Defendants' representations that the originators of the mortgage loans purportedly pooled in the Trust adhered to their own underwriting guidelines regarding such matters as owner-occupancy and LTV, including those guidelines regarding deviations from the originators' usual loan criteria. The originators for the Securitizations (together, the "Originators") were as follows:

**Table 8**

| Trust | Originator(s) |
|-------|---------------|
| HASC 2006-OPT1 | Option One Mortgage Corporation |
| HASC 2006-OPT2 | Option One Mortgage Corporation |
| HASC 2006-OPT3 | Option One Mortgage Corporation |
| HASC 2007-HE1 | Accredited Home Lenders, Inc. and Decision One |
| HASC 2006-HE2 | WMC Mortgage Corp., Countrywide Home Loans, Inc. and Decision One |
| HASC 2006-HE1 | WMC Mortgage Corp. and Countrywide Home Loans, Inc. |
| HASC 2006-WMC1 | WMC Mortgage Corp. |

110.    Underwriting guidelines are the backbone of any mortgage-backed security. They define lending practices that are meant to assess a borrower's ability to repay the mortgage obligation. They are the link between the lender's first-hand interaction with the borrower and the investor that ultimately assumes the risk of the borrower's default. Countless investigations and reports have now established that the failure to adhere to underwriting guidelines was one of

the primary causes of the financial crisis. *See, e.g.*, FCIC Report, Conclusions at xxiii ("We conclude collapsing mortgage-lending standards and the mortgage securitization pipeline lit and spread the flame of contagion and crisis."). The originators of the loans that were pooled into the Securitizations are among those that later became notorious for their lack of adherence to underwriting guidelines.

111.    The Prospectus Supplements for the Securitizations stated that the loans conformed to the underwriting guidelines of the respective originator, unless the loans possessed additional compensating factors. In particular, the Prospectus Supplement for HASC 2006-OPT3 stated that "[t]he Mortgage Loans were originated or acquired by the Originator generally in accordance with the underwriting guidelines described in this prospectus supplement." (*See* Pro. Supp. at S-29.) The Prospectus Supplements for the other Trusts contained substantially similar statements. (*See* Appendix A.)

112.    Although exceptions to the underwriting guidelines were permissible, "[o]n a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made *where compensating factors exist*." (*See* Pro. Supp. HASC 2006-OPT3 at S-39) (emphasis added.) The Prospectus Supplements for the other Trusts contained substantially similar statements. (*See* Appendix A.)

113.    In other words, the Offering Documents unambiguously represented that if no compensating factors were present, the loan had to comply with the underwriting guidelines, or it could not be included in the Securitization. With respect to each of the Securitizations, Plaintiffs' analysis of appraisal values and owner-occupancy data demonstrates that a substantial percentage of the loans in the Loan Pools did not comply with the underwriting guidelines. (*See supra* Sections III.A., III.B.)

114.   The disclosures in the Offering Documents concerning adherence to underwriting standards or compensating factors were false.  The HSBC Defendants knew they were false from their own actions and due diligence (*see supra* Section III. C.), which demonstrated that originators systematically disregarded their underwriting guidelines (information that only later became generally available to the public).  The HSBC Defendants nevertheless represented to investors, such as Plaintiffs, that the underwriting guidelines were being followed.

### B.   The Originators' Abandonment of Their Underwriting Guidelines

115.   The rampant abandonment of underwriting guidelines by loan originators is now well-documented.  The deterioration of underwriting quality at each of the Originators at or about the time of the Securitizations has been confirmed in detailed government investigative reports, news reports and Court opinions.

### 1.   Option One Mortgage Corporation

116.   Option One Mortgage Corporation ("Option One") originated all of the mortgage loans in the HASC 2006-OPT1, HASC 2006-OPT2 and HASC 2006-OPT3 Securitizations. Option One has been identified through multiple reports and investigations for its substantial underwriting failures. On June 3, 2008, for instance, the Attorney General for the Commonwealth of Massachusetts filed an action against Option One, and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans. *See Complaint, Commonwealth v. H&R Block, Inc.*, 08-2474-BLS (Mass. Super. Ct. June 3, 2008). According to the Massachusetts Attorney General, since 2004, Option One "increasingly disregarded underwriting standards ... and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan

origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." *Id* at ¶ 4.

117.    The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home," and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." *Id.* at ¶ 8. Option One's "origination policies ... employed from 2004 through 2007 have resulted in an explosion of foreclosures." *Id.* at ¶ 10.

118.    On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction that prevented Option One from foreclosing on thousands of its loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, No. 08-2474-BLS1, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008). On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction. *See Commonwealth v. Option One Mortgage Co.*, No. 916 N.E. 2d 422 (Mass. App. Ct. 2009).

119.    On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, had agreed to settle the suit for approximately $125 million. *See* Massachusetts Attorney General Press Release, "H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions" (August 9, 2011). Media reports noted that the suit was being settled amidst ongoing discussions among multiple states' attorneys general, federal authorities, and five major mortgage servicers, aimed at resolving investigations of the lenders' foreclosure and mortgage-servicing practices. The Massachusetts Attorney General released a statement saying that no settlement should include a release for conduct relating to the lenders' packaging of mortgages into securitizations. *See* Bloomberg.com,

*H&R Block, Massachusetts Reach $125 Million Accord in State Mortgage Suit*, available at

http://www.bloomberg.com/news/2011-08-09/h-r-block-massachusetts-reach-125-million-

accord-in-state-mortgage-suit.html (published August 9, 2011).

### 2. Accredited Home Lenders, Inc.

120.    Accredited Home Lenders, Inc. ("Accredited") originated loans in the HASC

2007-HE1Securitization.  The systematic deviation from professed underwriting standards by

Accredited has previously been cited by at least one federal court in denying a motion to dismiss.

In *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008), the

court held that the plaintiff adequately pleaded false and misleading statements based upon

senior management's statements regarding the company's underwriting practices:

> **Defendants' statements regarding Accredited's underwriting practices were
> allegedly false and misleading because Defendants had caused Accredited to
> deviate from the company's publicly professed standards.** The Court
> concludes that with respect to both of these theories Plaintiff has adequately
> alleged false and misleading statements and the reasons those statements were
> false and misleading.

*Id.* at 1154 (emphasis added).

121.    Specifically, the Court in *Atlas* sustained allegations regarding widespread

exceptions to Accredited's underwriting guidelines:

> By the beginning of the class period on November 1, 2005, however, Defendants
> allegedly caused Accredited's employees to disregard the company's stated
> underwriting guidelines in an effort to increase the volume of loans originated by
> Accredited. **The Complaint contains the allegations of several confidential
> witnesses who detail pervasive, widespread exceptions to the Company's
> underwriting policies and substantial pressures to approve such loans at the
> end of reporting periods in an effort to meet financial projections.** According
> to the allegations of the Complaint, the individual defendants were not only aware
> of these practices but affirmatively mandated and/or encouraged them. Publicly,
> however, Defendants allegedly continued to represent that Accredited was
> committed to a disciplined approach that focused on credit quality even though
> Defendants knew that they had caused the company to abandon adherence to its
> underwriting policies.

*Id.* at 1150 (emphasis added, citations omitted); *see also Atlas*, 2009 WL 3698393 (Nov. 4, 2009) (order approving $22 million settlement).

122.     Moreover, the Court found that the "Complaint allege[d] with specificity that . . . managers pressured [former employees] to approve loans that did not comply with the company's own policies for the purpose of increasing loan volume and reporting earnings consistent with (or exceeding) analysts' expectations." *Id.* at 1156 (citations omitted).  Accredited's rampant disregard for its own underwriting standards eventually contributed to its failure and filing for chapter 11 bankruptcy protection in May of 2009.

123.     The HSBC Defendants had a very close relationship with Accredited.  In fact, according to bankruptcy filings, Defendant HSBC Bank was the single largest unsecured creditor of Accredited, and submitted over $90 million worth of repurchase claims in the bankruptcy proceeding.

### 3.     Decision One Mortgage Company, LLC

124.     Decision One originated loans for the HASC 2006-HE2 and HASC 2007-HE1 Securitizations.  At all relevant times, Decision One was in fact a wholly-owned subsidiary of Defendant HSBC Holdings.

125.     According to a 2011 Complaint, from 2006 to 2007, certain information in Decision One's loan files was overlooked and the files were just "passed on" and approved regardless of the merits.  Complaint ¶ 95 n.10, *Allstate Ins. Co., et al. v. Morgan Stanley, et al.*, No. 651840/2011 (N.Y. Sup. Ct. filed July 5, 2011).  In a separate complaint filed in 2010, Federal Home Loan Bank of Chicago alleged that Decision One's internal deficiency reports showed quality issues "in tens of millions of dollars worth of defaulted loans," and that during an internal audit, Decision One "tore those loans apart and found a lot of fraud." *Federal Home*

*Loan Bank of Chicago v. Banc of America*, No. 10-ch-45003, Complaint ¶¶ 261-262, (Ill. Cir. Ct. filed Oct. 15, 2010).

126. Further, according to The Record, a West Virginia legal journal, Decision One has been accused by borrowers of intentionally relying on out-of-town appraisers to inflate the values of homes to induce the borrowers to close on loans. Cara Bailey, *Three suits accuse company of predatory lending*, The Record (Jan. 12, 2007) *available at* http://www.wvrecord.com/news/188966-three-suits-accuse-company-of-predatory-lending (last visited Aug. 14, 2012).

127. Decision One ceased operations in September 2007.

### 4. WMC Mortgage Corp.

128. WMC originated loans for the HASC 2006-HE1, HASC 2006-HE2, and HASC 2006-WMC1 Securitizations. WMC ranked fourth on the OCC's November 13, 2008 "Worst Ten in the Worst Ten" list of the nation's most egregious originators from 2005 through 2007 in the ten cities with the highest foreclosure rates in the country. OCC Press Release, "Worst Ten in the Worst Ten," Nov. 13, 2008.

129. On June 4, 2008 the Washington State Department of Financial Institutions, Division of Consumer Services entered a "Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit from Industry, Impose Fine, Order Restitution, and Collect Investigation Fee" related to WMC's alleged deceptive and unfair practices, disclosure failures, and use of an unregistered mortgage broker. Statement of Charges C-07-557-08-SCOI, June 4, 2008. A consent order was filed imposing fines and restitution. Consent Order, C-07-557-09-CO02, July 21, 2008.

130. Reports regarding WMC's failure to follow underwriting standards revealed that "[i]n interviews with iWatch News, eight former WMC employees claim WMC's management

ignored them when they reported loans supported by falsified documents, inflated incomes or other legerdemain. Two of them say they were transferred and demoted because they pressed too hard to expose corrupt practices." Michael Hudson, Fraud and folly: The untold story of General Electric's subprime debacle, iWatch News by The Center for Public Integrity, Jan. 6, 2012 (updated Jan. 23, 2012), *available at* http://www.iwatchnews.org/2012/01/06/7802/fraud-and-folly-untold-story-general-electric-s-subprime-debacle.

131. Further, "Dave Riedel, a former compliance manager at WMC, says sales reps intent on putting up big numbers used falsified paperwork, bogus income documentation and other tricks to get loans approved and sold off to Wall Street investors. One WMC official, Mr. Riedel claimed, went so far as to declare: 'Fraud pays.'" *Id.*

### 5. Countrywide Home Loans, Inc.

132. Countrywide Home Loans, Inc. ("Countrywide") originated loans for the HASC 2006-HE1 and HASC 2006-HE2 Securitizations. Countrywide's flagrant disregard for its own underwriting guidelines are now infamous, as demonstrated by internal emails and governmental investigations.

133. In an April 13, 2006 email, Countrywide Financial's Chief Executive Officer, Angelo Mozilo, stated that he had "personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]. In my conversations with Sambol he calls the 100% subprime seconds as the 'milk' of the business. Frankly I consider that product line to be the poison of ours." *S.E.C. v. Mozilo*, CV 09-3994-JFW MANX, 2010 WL 3656068, at *17 (C.D. Cal. Sept. 16, 2010).

134. A March 11, 2008 Wall Street Journal article stated that federal investigators found that "Countrywide's loan documents often were marked by dubious or erroneous

information about its mortgage clients. . . ." Glenn R. Simpson, *Loan Data Focus of Probe*, The Wall Street Journal, Mar. 11, 2008.

135.    On August 16, 2010, in its brief opposing summary judgment, the SEC stated that "the 'exceptions' culture at Countrywide started at the top. [Angelo] Mozilo himself was responsible for some of the exception loans made at Countrywide. Mozilo underwrote and approved loans pursuant to a program coined as Friends of Angelo ("FOA"). In many instances, Mozilo approved loans that were in direct contravention of Countrywide's own credit policies and underwriting guidelines." *SEC v. Mozilo*, No. 09-cv-03994, Dkt. No. 301 (Aug. 16, 2010).

136.    In its Report, the FCIC singled out Countrywide for its role in the financial crisis:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*See* FCIC Report at xxii.

## V.    ALTERNATIVELY, DEFENDANTS NEGLIGENTLY MISREPRESENTED THE CREDIT CHARACTERISTICS, UNDERWRITING STANDARDS, AND RATINGS ASSOCIATED WITH THE LOANS UNDERLYING THE TRUST

137.    The HSBC Defendants had a duty to take reasonable care to ensure that they were not misrepresenting the special facts that they alone possessed and controlled with respect to LTV and weighted LTV ratios (*supra* Section III.A.), owner-occupancy rates (*supra* Section III. B.), adherence to the originators' underwriting guidelines (*supra* Section IV. A.), the risk profiles reflected in the ratings granted to the Certificates (*infra* Section IX.), and the timely transfer of mortgages and notes to the Trusts (*infra* Section VI. B.). As described above, substantial evidence exists to show that the HSBC Defendants knew that the information in the Offering

Documents was false at the time they made the misrepresentations. However, given the substantial misrepresentations that Plaintiffs have uncovered, the HSBC Defendants' failure to inform Plaintiffs accurately about the loans underlying the Trusts was, at the very least, negligent.

138.    Moreover, because Plaintiffs could not possibly have known about the true quality of the collateral underlying the Trusts without access to the loan files that the HSBC Defendants exclusively possessed, the HSBC Defendants knew that Plaintiffs were reasonably relying on the truth of the representations in the Offering Documents regarding the characteristics of the collateral. Plaintiffs suffered losses as a result of these misrepresentations, as further alleged, *infra*, Section XI.

## VI.    DEFENDANTS MADE MISLEADING MISSTATEMENTS REGARDING TRANSFER AND ASSIGNMENT OF THE MORTGAGES AND NOTES IN THE TRUSTS

139.    The Offering Documents for the Trusts contained numerous misrepresentations concerning the timely and effective transfer and assignment of notes and mortgages to the Trusts. Through their investigation of publicly-recorded assignments and satisfactions, Plaintiffs have discovered that the HSBC Defendants' representations that all of the notes and mortgages would be transferred and assigned to the Trusts in bulk as of the respective closing date were false. The ***vast majority*** of the notes and mortgages Plaintiffs found were not transferred or assigned to the Trusts at issuance, or even within three months thereafter.

140.    Plaintiffs conducted two separate investigations ("Investigation 1" and "Investigation 2") of a large number of assignments of mortgages ("Assignments") and satisfactions ("Satisfactions") associated with loans represented to be a part of the Loan Pools. Both investigations disclosed evidence that the HSBC Defendants' representations that all of the

notes and mortgages were being transferred to the Trusts as of the respective closing dates were false.

141.    The Assignments purport to convey the notes and mortgages to the Trust at dates as much as *years* after closing. These Assignments, which are generally executed under penalty of perjury, are wholly inconsistent with any purported previous assignment and transfer of these mortgages and notes to the Trusts.

142.    The Offering Documents represented that the Trusts were to hold all the notes and mortgages as of the date the Trusts closed and the Certificates were issued. Not only was this not true, but upon information and belief, at the time the the HSBC Defendants represented that the notes and mortgages were being transferred to the Trusts by or at closing, they did not intend to fulfill that obligation. In fact, the HSBC Defendants had routinely failed to effectuate such transfers in past securitizations, and this practice, motivated by the HSBC Defendants' desire to secure even greater profits was systemic.

143.    Plaintiffs reasonably relied on the HSBC Defendants' representations in the Offering Documents for the Trusts, and therefore believed at the time they purchased the Certificates that the Trusts that issued the Certificates in fact held the mortgages on the underlying loans. The Plaintiffs' investigation shows this was not the case.

144.    This belief was an essential part of the contracts of sale for the Certificates in the Trusts. Plaintiffs would not have purchased so-called "mortgage-backed" securities that were not actually backed by the mortgages represented to be in the pools, for at least three reasons: (1) when securities are not backed by actual mortgages or notes, the trusts are left without any legal recourse against borrowers that cease making payments, and (2) valid and timely transfer and assignment of the notes and mortgages are essential to an RMBS trust's tax status as a REMIC,

and therefore necessary to avoid highly punitive tax consequences which would ultimately be borne by investors; and (3) valid and timely foreclosure is necessary to limit losses on defaulted loans as delays in foreclosure proceedings can significantly increase loss severities due to foregone interest, late charges, additional fees, and exposure to housing market declines which reduce the market value of the collateral and the liquidation proceeds.

**A.    Statements Regarding Assignments of Mortgages and Transfer of Notes to the Trusts**

145.    The Issuer Defendants represented in the Offering Documents that the Certificates would represent interests in the notes and mortgages outlined therein, *i.e.*, that they would be "mortgage-backed." The Prospectus Supplements stated: "The mortgage loans to be included in the trust will be comprised of adjustable and fixed rate, interest-only, fully amortizing and balloon mortgage loans secured by first and second lien mortgages or deeds of trust on one- to four-family residential real properties." HASC 2006-OPT3 Pro. Supp. at S-3. The Prospectus Supplements for the other Trusts contained substantially similar statements. (*See* Appendix A.)

146.    Indeed, each of the Offering Documents described the Certificates as "Mortgage Pass-Through Certificates" and repeatedly used the term "mortgage-backed" in describing the Certificates.

147.    The Issuer Defendants further represented in the Offering Documents that the notes and mortgages underlying the Securitizations were to be transferred to the Trusts on the closing dates. The Prospectus Supplement for the HASC 2006-OPT3 trust stated:

> At the time of issuance of each series of securities, the depositor will cause the assets comprising the related trust or mortgage securities included in the related trust to be assigned to the trustee. The residential loan or agency security documents described below will be delivered to the trustee or to the custodian. The trustee will, concurrently with the assignment, deliver the securities to the depositor in exchange for the assets of the trust.

HASC 2006-OPT3 Pro. Supp. at 47. The Prospectus Supplements for the other Trusts contained

substantially similar statements. (*See* Appendix A.)

148. In addition, the Prospectus Supplement for HASC 2006-OPT3 (at page S-120)

represented that an opinion of legal counsel regarding the Trusts' REMIC status would be

supplied:

> Upon the issuance of the Offered Certificates, McKee Nelson LLP
> ("Tax Counsel") will deliver its opinion to the effect that, assuming
> compliance with the Pooling and Servicing Agreement, for federal
> income tax purposes, each Lower-Tier REMIC and the Upper-Tier
> REMIC will qualify as a REMIC within the meaning of Section
> 860D of the Code.

The Prospectus Supplements for the other Trusts contained substantially similar statements. (*See*

Appendix A.)

149. The HSBC Defendants also promised to deliver the promissory notes to the

Trustees for the Trusts. The Prospectus Supplement for the HASC 2006-OPT3 Trust (at page S-

42) represented:

> In connection with the transfer and assignment of each Mortgage
> Loan to the Trust, the Depositor will cause to be delivered to the
> Custodian, on behalf of the Trustee, on or before the Closing Date,
> the following documents with respect to each Mortgage Loan
> which constitute the mortgage file: (a) the original mortgage note,
> endorsed without recourse in blank by the last endorsee, including
> all intervening endorsements showing a complete chain of
> endorsement from the Originator to the last endorsee; (b) the
> original of any guaranty executed in connection with the mortgage
> note (if provided); (c) the related original mortgage and evidence
> of its recording or, in certain limited circumstances, a copy of the
> mortgage certified by the Originator, escrow agent, title insurer, or
> closing attorney...

The Prospectus Supplements for the other Trusts contained substantially similar statements. (*See*

Appendix A.)

**B.** **Failure to Timely Transfer**
**Mortgages and Notes Into the Trusts**

150.    Plaintiffs have investigated and analyzed loan-level information for the Trusts to determine the accuracy of certain representations made in the Prospectus Supplement, including representations regarding the assignment and transfer of mortgages and notes to the Trusts.

**1.    Failure to Timely Assign Mortgages to the Trusts**

151.    Plaintiffs' Investigation 1 involved a review of Assignments and Satisfactions connected to mortgages represented to have been deposited into the Trusts on or before the closing date.

**(a)    Satisfactions**

152.    First, a substantial number of the sampled notes and mortgages underlying the Securitizations were apparently never transferred to the Trusts. This fact is demonstrated by the Satisfactions. *See* Exhibit 1; Appendix B. A Satisfaction is a release of the lien, issued by the then-present holder of the note and mortgage at the time the loan is paid off. Satisfactions can thus demonstrate that, at a point in time after the Certificate was issued – and thus after the date the Offering Documents represented the note and mortgage would be transferred to the trustee on behalf of the trust – the respective note and mortgage referred to therein were held by a party other than the trustee.

153.    The Satisfactions that were made on behalf of the original lender similarly show that these notes were never transferred to the Trust, because only the current holder of the note can release the borrower from the lien on the property. Where the Satisfaction is in the name of the original lender, this indicates that the original lender still holds the note and never transferred it to the Trust.

154.    Plaintiffs' Investigation 1 revealed numerous documents listing the original mortgage lender as the holder of the mortgage and note.  The Satisfactions in which an entity other than the Trust or Trustee was identified as the holder of the note and mortgage at the time of the Satisfaction are attached as Exhibit 1, and quotations of the pertinent portions are set forth in Appendix B.  For example:

- **HASC 2006-OPT1 0005, dated July 11, 2007** — stating that MERS, as nominee for **Dream House Mortgage Corporation, "the owner and holder"** of the mortgage, "[h]ereby acknowledges full payment and satisfaction of said note and mortgage deed, and surrenders the same as cancelled, and hereby directs the Clerk of the said Circuit Court to cancel the same of record," **more than one year and five months after the closing date of February 3, 2006.**

- **HSI 2006-WMC1 0004, dated June 13, 2008** — stating that MERS, as nominee for **WMC Mortgage Corp., "the holder of a certain Mortgage"** . . . "does hereby acknowledge that it has received full payment and satisfaction of the same, and in consideration thereof, does hereby cancel and discharge said Mortgage," **more than one year and ten months after the closing date of August 4, 2006.**

155.    In these and each of the other numerous examples attached hereto, the satisfying party was not the trustee or acting on its behalf.  These documents, therefore, show that the mortgage and note were never transferred to the Trust.

### (b)    Assignments

156.    The publicly filed Assignments further provide compelling evidence that of those mortgages that were purportedly transferred to the Trusts at some point, many, if not all, were assigned long after the Trust had closed.  The language of these Assignments varies by jurisdiction, but many show that someone other than the Trustees held the mortgage as of the closing date of the Securitization.  Indeed, many of them make explicit what is implicit in the others: that the Trustee not only failed to hold the mortgage as of the closing date of the respective Securitization, but also failed to hold the note establishing the borrower's debt.

Plaintiff's Investigation 1 revealed that a substantial number of Assignments involving loans purportedly underlying the Securitizations provide evidence that the Trust or Trustee did not hold the note and/or mortgage as of the closing date of the respective Securitization. The Assignments evidencing that the Trust or Trustee failed to hold the note and/or mortgage as of the closing date of the respective Securitizations are included in Exhibit 2, and quotations of the pertinent portions are set forth in Appendix B.

157. The following are just a few examples of Assignments that clearly demonstrate that the subject mortgage was not assigned to the Trusts until long after the Certificates were issued on their respective closing dates:

- **HSI 2006-WMC1 0019, dated December 30, 2009** — stating that MERS, as nominee for WMC Mortgage Corporation, "does hereby grant, bargain, sell, assign, transfer and set over unto" the Trustee the mortgage, "together with the note," more than three years and four months after the closing date of August 4, 2006.

- **HSI 2007-HE1 0005-07, dated July 13, 2009** — stating that MERS, acting solely as a nominee for Decision One Mortgage Company, LLC, "does grant, bargain, sell, assign and transfer to" the Trustee the mortgage "[t]ogether with the note," more than two years and four months after the closing date of March 8, 2007.

158. In these and each of the other numerous examples attached hereto, the assignor party was not the trustee or acting on its behalf. These documents therefore show that the first attempt to transfer the mortgage and note to the Trust occurred long after the Trust closed, contrary to the representations in the Offering Documents

159. In sum, Investigation 1 compared the date of the Assignments with the date of the issuance of the Certificates, and found that *none* of the sampled Assignments was made to the respective Trust at closing as represented in the Offering Documents. Further, nearly all of those Assignments were executed more than three months after the Securitizations' closing, contrary to the representations in the Offering Documents.

160.    Separately, in Investigation 2, which assessed a separate, random sample of documents from county clerk's offices across the country, the Plaintiffs analyzed more than 1000 separate loans from the Loan Pools.  Investigation 2 provides additional and independent support for Plaintiffs' allegation that none of the mortgages purportedly underlying the Securitizations was assigned to the Trust or Trustee at the time of the issuance of the Certificates or within three months thereafter, as was represented in the Offering Documents.  Plaintiffs' sample of Assignments for loans purportedly held by each of the Trusts revealed that as much as 39% of the mortgages sampled for a given Trust are currently recorded as being assigned to a party other than the Trust or Trustee.

**Table 9**

| Trust | Sample Size | Percentage of sample evidencing assignments to the Trusts as of closing date or within 3 months thereof | Percentage of sample evidencing assignments to a party other than the Trust |
|-------|-------------|----------------------------------------------------------------------------------------------------------|------------------------------------------------------------------------------|
| HASC 2006-OPT1 | 89 | 0% | 34.8% |
| HASC 2006-HE2 | 221 | 0% | 14.9% |
| HASC 2006-OPT3 | 114 | 0% | 38.6% |
| HASC 2007-HE1 | 87 | 0% | 39.1% |
| HASC 2006-WMC1 | 185 | 0% | 35.1% |
| HASC 2006-HE1 | 171 | 0% | 9.4% |
| HASC 2006-OPT2 | 219 | 0% | 36.5% |

161.    In short, Plaintiffs have found that the vast majority of the mortgages purportedly backing the Trusts since issuance were assigned to the Trusts well after the closing date,  more than three months after the trust closed, in violation of REMIC requirements.

### 2. Failure to Timely Transfer the Notes to the Trusts

162. The Assignments all also evidence a transfer of the promissory notes to the Trusts, not at the time of securitization, but contemporaneously with the assignment of the mortgages, as the language quoted above reveals. For example:

- **HSI 2007-HE1 0009-10, dated January 20, 2010** — stating that MERS, as nominee for Accredited Home Lenders, Inc., "does hereby grant, bargain, sell, assign, transfer and set over unto" the Trustee the mortgage **"together with the note,"** more than two years and ten months after the closing date of March 8, 2007.

- **HSI 2006-HE2 0014, dated July 22, 2010** — stating that MERS, as nominee for WMC Mortgage Corp., "does hereby grant, bargain, sell, assign, transfer and set over unto" the Trustee the mortgage, **"[t]ogether with the note,"** more than three years and seven months after the closing date of December 5, 2006.

163. These documents, dated long after the closing date, clearly indicate a contemporaneous transfer of the note, which—contrary to what was represented in the Offering Documents—had *not* previously been transferred to, or held by, the Trusts.

164. Without the proper and timely transfer of the note, the Trusts do not have the legal right to collect principal and income payments from borrowers. Moreover, without a properly transferred note, the Trusts may be prevented from foreclosing on the property of a defaulted borrower or may encounter delays in foreclosing on the property thus incurring additional costs and losses for the Trusts.

165. As an additional check on whether notes were properly transferred to the Trusts, Plaintiffs investigated foreclosure proceedings for notes that were represented to have been endorsed and transferred to the Trusts at closing. Because a promissory note is a negotiable instrument, a transfer of its ownership requires that it be endorsed by the transferor, either to a named transferee or in blank—as specifically required by the PSA that established each of the Trusts. While Plaintiffs do not generally have access to the notes without discovery given that the promissory notes are generally not recordable documents, such notes can appear in the public

record in connection with foreclosure proceedings. For example, a review of a foreclosure proceeding involving one of the loans purportedly underlying the HASC 2006-0PT3 Trust revealed that the note, which was represented in the Offering Documents to have been transferred to the HASC 2006-0PT3 Trust, was never endorsed. (*See* Exhibit 3.) Without an endorsement, the HASC 2006-0PT3 Trust never became a holder of the note.

### 3. The HSBC Defendants' Knowledge of the Failure to Transfer Notes and Mortgages to the Trusts

166. As the depositor for each Securitization, HASC was responsible for depositing the mortgages and notes into the Trusts, pursuant to the terms of the Offering Documents.

167. But, in fact, based on Plaintiffs' investigations, in years prior to the issuance of the Certificates, the ongoing practice of HASC was to not transfer mortgages into the RMBS trusts that they securitized and HASC failed to do so with the Securitizations in this case. It is apparent that the HSBC Defendants knowingly engaged in a continuing and deliberate practice of not effectuating transfers of notes and mortgages to RMBS trusts that they created, marketed, and sold. Accordingly, the HSBC Defendants knew and intended, when drafting the Offering Documents for the Securitizations, that contrary to the express representation in the Offering Documents that the Securitizations would be backed by mortgages (*see supra* Section IV.A.), Defendant HASC, the depositor, would not transfer endorsed notes and mortgages to the Trusts, as of the date of the Securitizations' closing. The other HSBC Defendants similarly knew and intended, when they created, marketed, and sold the Certificates to Plaintiffs, that contrary to the express representation in the Offering Documents that the Securitizations would be backed by mortgages (*id.*), endorsed notes and mortgages were not being transferred to the Trusts as of the dates of the Securitizations' closing.

168. That HASC's practice was to not assign and transfer the mortgages and notes into RMBS Trusts was a fact peculiarly within the HSBC Defendants' knowledge. The Plaintiffs could not have known that HASC was not carrying out the transfer and assignment of the notes and mortgages to the Trusts.

169. As discussed above, given the substantial overlap in management between the HSBC Securities, the lead underwriter on each of the Securitizations, and all other HSBC Defendants, and HSBC Securities' involvement in numerous HASC offerings prior to the Trusts, HSBC Securities also knew or was reckless in not knowing that HASC was not timely assigning and transferring the mortgages and notes to the Trusts prior to HSBC Securities sale of the Certificates to the DZ Bank. The Underwriter Defendant nevertheless transmitted Offering Documents that it knew, or but for its recklessness would have known, contained false representations concerning the transfer and assignment of the notes and mortgages. Moreover, as described above, the Parent Defendants dominated and controlled HASC. The Parent Defendants and HSBC Securities are thus liable for the fraud as well.

C. **Material Undisclosed Risks to Investors Resulting From the Failure to Assign the Mortgages and Notes to the Trusts**

170. The assignment of the mortgages and notes into the trust is perhaps the single most essential part of the mortgage-backed securitization process. Without these assignments, the securities are not "mortgage-backed" at all.

1. **Foreclosure and Contractual Remedy Consequences**

171. When the HSBC Defendants fail to transfer the mortgages and notes to the Trusts, when borrowers default on their obligations, as they have done in record numbers since the Certificates were issued, the Trusts cannot legally foreclose on the mortgages. Indeed, courts all over the country frequently barred RMBS trusts from foreclosing on the loans purportedly

underlying the trusts due to improper or non-existent mortgage and/or note transfers.[4]  The

offering documents and governing agreements applicable to the trusts involved in those suits

contained bulk assignment language substantially similar, if not identical, to the assignment

language in the Offering Documents and governing agreements for the Trusts.

172.    Moreover, apart from foreclosure, the only other remedy available to the Trusts to

collect on the obligation where a borrower ceases to make payments is to bring an action in

contract under the promissory note.  However, the Issuer Defendants' failure to transfer the notes

into the Trusts prevents the Trusts from pursuing this remedy as well.  Delays in foreclosures due

to improper documentation result in unanticipated losses due to additional months or years of

foregone interest, late charges, and diminution in the market value of the collateral as a result of

declines in housing markets.  Where the mortgage and note have not been assigned, the Trusts

have no legal recourse if a borrower ceases to make payments to the Trusts and must incur a

significant loss.

## 2.    Tax Consequences

173.    The second significant consequence of the Issuer Defendants' failure to timely

assign qualified mortgages to the Trusts affects the tax status of those Trusts.

174.    RMBS trusts may avoid taxation at the entity level if they qualify as REMICs

under the Internal Revenue Code and the Treasury regulations promulgated thereunder.  RMBS

---

[4] *See, e.g., U.S. Bank, N.A. v. Ibanez*, 458 Mass. 637 (2011); *HSBC Bank USA, N.A. v. Taher*, No. 9320/09,
2011 WL 261052532 (N.Y. Sup. Ct. Kings Co. July 1, 2011); *Wells Fargo Bank, N.A. v. Ford*, 418 N.J. Super. 592,
593 (App. Div. 2011); *Beaumont v. Bank of New York Mellon*, 81 So. 3d 553, 554 (Fla. Dist. Ct. App. 2012);
*Naranjo v. SBMC Mortgage*, No.3:11-cv-02229-L-WVG, Dkt. #20, p. 6 (S.D. Cal. July 24, 2012); *Lasalle Bank,
N.A. v. Diaz*, No. 08 CH 21809, 2009 WL 1935920 (Ill. Cir. Cook Co. June 1, 2009); *PHH Mortg. Corp. v.
Kolodziej*, 798 N.W.2d 319 (Wis. Ct. App. Mar. 10, 2011); *Deutsche Bank Nat'l Trust v. Brumbaugh*, 270 P.3d 151
(Okla. 2012); *In re Wilhelm*, 407 B.R. 392 (Bankr. D. Idaho 2009); *U.S. Bank, N.A.  v. Wilder*, No. 11CV7697, 2012
WL 2396723 (Kan. Dist. Ct. Johnson Co. June 25, 2012); *Bellistri v. Ocwen Loan Servicing, LLC*, 284 S.W.3d 619,
623-4 (Mo. Ct. App. 2009); *In re Bass*, 720 S.E.2d 18 (N.C. Ct. App. 2011); *Wells Fargo Bank, N.A. v. Lupori*, 8
A.3d 919 (Pa. Super. Ct. 2010); *U.S. Bank, N.A. v. Kimball*, 27 A.3d 1087 (Vt. 2011).

trusts that qualify as REMICs become pass-through entities not subject to taxation on interest they collect or gains in the value of the collateral they hold. *See* Internal Revenue Code § 860A(a).

175.    However, trusts not qualifying as REMICs are simply considered corporations and taxed at the applicable corporate tax rate. *See* Internal Revenue Code §§ 11(a), 7701(i)(1), 7704(a). Certificate holders in RMBS trusts that do not qualify as REMICs are subject to "double taxation." Certificate holders are always taxed on the income distributions they receive from the trust, regardless of whether the trust is a REMIC or not. However, if the trust is not a REMIC, then the trust (and effectively investors) must pay additional taxes on interest collected and gains in collateral value. The trusts makes those payments from funds that would otherwise have been distributed to investors.

176.    To qualify as a REMIC, a trust must own assets principally consisting of "qualified mortgages" or "other investments." *See* Internal Revenue Code § 860D(a)(4). If more than a *de minimis* amount of a trust's assets are something other than qualified mortgages or other investments, the trust will not qualify as a REMIC and will be taxed as a corporation.

177.    In addition, to qualify as a REMIC, a trust must be a passive investment vehicle rather than an active real estate lending business. In other words, the trust's assets must consist of a fixed pool of mortgages that were assigned to the trust no later than three months after the "startup day" (*i.e.*, day interests in the trust are issued). *See* Internal Revenue Code § 860D(a)(4). The REMIC may not receive new contributed mortgages into its pool after the startup day, nor any new mortgages into its pool after the three-month deadline. Any mortgages added after that 3-month window do not constitute "qualified mortgages."

178.   If any new mortgages are transferred to the trust after three months, the REMIC will lose its favorable tax status, with several adverse consequences to investors: (1) the trust's income will be subject to corporate double taxation; (2) the income from the late transferred mortgages will be subject to a 100% tax; and (3) if late transferred mortgages are received through contribution, the value of the mortgages will be subject to a 100% tax. *See* Internal Revenue Code §§ 860D, 860F(a), 860G(d).  Moreover, by conducting an active business in acquiring new mortgages rather than merely passively investing in the initial fixed pool, the RMBS trust risks losing REMIC status in its entirety.

179.   If a trust that previously elected REMIC status is later found never to have qualified as a REMIC, or is found to have ceased qualifying as a REMIC, the trust is subject to retroactive taxation at the prevailing corporate tax rate and potential additional penalties for underpayment of tax and/or fraudulently purporting to be a REMIC, *see* Internal Revenue Code §§ 6501(c), (e); 6662(a); 6663(a).  These taxes and penalties are ultimately borne by investors.

180.   As a consequence of the HSBC Defendants' failure to assign notes and mortgages, the Trusts are subject to action by the Internal Revenue Service to collect back taxes, interest and penalties and to future taxation as a corporation rather than a REMIC.  Should the IRS take action, investors, including Plaintiffs, will suffer a substantial diminution of future cash flows they would otherwise expect to collect from the Trust.  This risk significantly diminishes the value of the Certificates.

181.   In sum, the HSBC Defendants knowingly or recklessly made false representations in the Offering Documents that the Depositor Defendant would assign all notes and mortgages to the Trusts prior to the issuance of the Certificates and that the Trusts would qualify for favorable REMIC tax status.  The HSBC Defendants knew these representations to be false because they

had been securitizing RMBS for years without effecting assignments to the respective trusts. The HSBC Defendants knew that the Trusts therefore could not qualify for favorable REMIC tax status.

## VII. ALTERNATIVELY, DEFENDANTS MADE NEGLIGENT MISREPRESENTATIONS CONCERNING THE MORTGAGES AND NOTES UNDERLYING THE SECURITIZATIONS

182. The HSBC Defendants knew they were not properly and timely transferring the mortgages and notes to the Trusts, because they were responsible for actually making the transfers. Thus, both the fact of the transfer and the timing of the transfer, were completely within their knowledge. Also, Plaintiff's have investigated previous securitizations issued by the HSBC Defendants, and learned that they repeatedly failed to timely transfer notes and mortgages in previous securitizations issued and underwritten by the HSBC Defendants, and yet did not correct this practice with respect to the Trusts.

183. Nevertheless, even if the HSBC Defendants were unaware that the notes and mortgages were not timely and properly transferred to the Trusts, then their false representations to Plaintiffs that proper transfers would be timely effected was due entirely to their own negligent conduct, because they could have and should have verified those statements.

184. Because Plaintiffs could not possibly have known about the HSBC Defendants' failure to timely assign and transfer the mortgages and notes at the time they purchased the Certificates, the HSBC Defendants knew that Plaintiffs were relying on the truth of the representations in the Offering Documents regarding such transfers.

185. Because of the HSBC Defendants' superior knowledge with respect to the transfer of the mortgages and notes to the trust as described above, the HSBC Defendants had a duty to take reasonable care to ensure that they were not misrepresenting the information that they alone possessed and controlled. Given the substantial misrepresentations that Plaintiffs have

uncovered, the HSBC Defendants' failure to inform Plaintiffs accurately about the loans underlying their Trusts was, at the very least, negligent.

## VIII. PLAINTIFFS AND BLAYLOCK AND (IN THE ALTERNATIVE) HSBC SECURITIES OPERATED UNDER A MUTUAL MISTAKE WITH RESPECT TO THE ASSIGNMENT OF THE MORTGAGES AND NOTES INTO THE TRUSTS

186.    Because Blaylock was not privy to the systematic assignment and transfer failures of HASC at the time it sold the HSH Plaintiffs their Certificates, both parties were acting under the mutually mistaken belief that the Certificates were secured by residential mortgages. Alternatively, if Blaylock was aware of the fraud, then it provided substantial assistance by knowingly providing false Offering Documents to the HSH Plaintiffs, and is liable for aiding and abetting the fraud. Similarly, in the alternative to DZ Bank's claims against HSBC Securities arising from the mortgage and note transfer fraud, if HSBC Securities was also acting with the understanding—albeit incorrect—that all of the mortgages had been assigned to the Trusts at the time the Certificates were issued, then this too was a mutual mistake. Plaintiffs are therefore entitled to rescission of their purchases.

187.    The mutually mistaken facts—that all of the mortgages and notes had been transferred to the Trusts prior to issuance of the Certificates and that the Trusts qualified for REMIC classification—were highly material to all the parties, and existed at the time the Certificates were purchased. The assignments were critical to Plaintiffs, because without valid, timely assignments of the mortgages and notes, Plaintiffs stood to lose millions of dollars through unrecoverable defaults and adverse tax consequences.

188.    Indeed, without transferring the mortgages and notes into the Trusts, these so-called "mortgage-backed securities" were not actually backed by mortgages. The sale of Certificates backed by residential mortgages was the essence of the contracts between Plaintiffs

and the Underwriter Defendants. Plaintiffs would not have purchased these Certificates had they known they were not backed by collateral or the notes.

189. Because of the existence of material mutual mistakes, the contracts under which Plaintiffs purchased the Certificates are void *ab initio*, and Plaintiffs are therefore entitled to rescission of their purchases of the Certificates.

## IX. THE ISSUER DEFENDANTS FAILED TO DISCLOSE THAT THEY OBTAINED THE RATINGS OF THE CERTIFICATES THROUGH FALSE REPRESENTATIONS TO THE RATINGS AGENCIES

190. In order to convince investors to purchase the Certificates, the Issuer Defendants obtained and marketed inflated ratings for the Certificates by misrepresenting the risk profile of the underlying loans to both Moody's and Standard & Poor's (together, the "Rating Agencies").

191. All of the Certificates purchased by Plaintiffs received high investment-grade ratings that were touted in the Offering Documents.

192. The Certificates at issue here have been subsequently downgraded at an alarming rate, as shown in Table 10 below.

## Table 10

| Trust | Tranche | Agency | Initial Rating | Effective Date | Current Rating | Effective Date |
|---|---|---|---|---|---|---|
| HASC 2006-OPT1 | M1 | Standard & Poors | AA+ | 2/7/2006 | B (sf) | 9/4/2012 |
| | | Moody's | Aa1 | 2/3/2006 | Caa2 (sf) | 7/18/2011 |
| HASC 2006-HE2 | 2A3 | Standard & Poors | AAA | 12/12/200 | CCC (sf) | 10/22/09 |
| | | Moody's | Aaa | 12/5/2006 | Ca (sf) | 8/13/2010 |
| HASC 2006-OPT3 | M1 | Standard & Poors | AA+ | 4/17/2006 | BB*- (sf) | 8/15/2012 |
| | | Moody's | Aa1 | 4/5/2006 | Caa1 (sf) | 8/13/2010 |
| HASC 2007-HE1 | 2A1 | Standard & Poors | AAA | 3/19/2007 | BB* (sf) | 8/15/2012 |
| | | Moody's | Aaa | 3/8/2007 | Ba3 (sf) | 8/13/2010 |
| HASC 2006-WMC1 | A3 | Standard & Poors | AAA | 8/9/2006 | CCC (sf) | 5/4/2009 |
| | | Moody's | Aaa | 8/8/2006 | Ca (sf) | 8/13/2010 |
| HASC 2006-HE1 | M2 | Standard & Poors | AA+ | 11/9/2006 | D (sf) | 12/24/2009 |
| | | Moody's | Aa2 | 11/3/2006 | C (sf) | 10/23/2008 |
| HASC 2006-OPT2 | M1 | Standard & Poors | AA+ | 3/2/2006 | BBB- (sf) | 9/4/2012 |
| | | Moody's | Aa1 | 3/23/2006 | Ba2 (sf) | 7/18/2011 |
| HASC 2006-OPT2 | M3 | Standard & Poors | AA | 3/2/2006 | CCC (sf) | 9/4/2012 |
| | | Moody's | Aa3 | 3/23/2006 | C (sf) | 7/18/2011 |
| HASC 2006-OPT2 | M4 | Standard & Poors | AA- | 3/2/2006 | CCC (sf) | 7/18/2011 |
| | | Moody's | A1 | 3/23/2006 | C (sf) | 8/13/2010 |
| HASC 2006-OPT2 | M5 | Standard & Poors | A | 3/2/2006 | CCC (sf) | 7/18/2011 |
| | | Moody's | A2 | 3/23/2006 | C (sf) | 8/13/2010 |
| HASC 2006-OPT2 | 2A3 | Standard & Poors | AAA | 3/2/2006 | A+ (sf) | 9/4/2012 |
| | | Moody's | Aaa | 3/23/2006 | A1 (sf) | 7/18/2011 |
| HASC 2006-OPT2 | 2A4 | Standard & Poors | AAA | 3/2/2006 | A+ (sf) | 9/4/2012 |
| | | Moody's | Aaa | 3/23/2006 | A2 (sf) | 7/18/2011 |
| HASC 2006-OPT2 | M2 | Standard & Poors | AA+ | 3/2/2006 | - B-(sf) | 9/4/2012 |
| | | Moody's | Aa2 | 3/23/2006 | Ca(sf) | 7/18/2011 |

193.    The high initial ratings were only achieved because the HSBC Defendants deliberately misled the rating agencies concerning, among other things, the CLTV ratios, owner-occupancy rates and adherence to underwriting guidelines.  These misrepresentations cause a

dramatic understatement of cumulative loss projections by understating the likely rates of default and loss severity. The analysis conducted by the Rating Agencies (and by Plaintiffs) therefore showed a much lower level of risk of loss due to the misrepresentations, and the ratings were not an accurate reflection of the true risk.

194.     The HSBC Defendants knew through their due diligence (*see infra* Section III. C) that the collateral data they supplied to the ratings agencies was inaccurate. Had an accurate picture of the Loan Pools been supplied to the ratings agencies, they never would have given the Certificates the high ratings that they did. The HSBC Defendants were therefore well aware that the ratings they represented in their Offering Documents were false and misleading.

## X.     PLAINTIFFS REASONABLY RELIED ON DEFENDANTS' MISREPRESENTATIONS IN DECIDING TO PURCHASE THE CERTIFICATES

195.     Both DZ Bank and the HSH Plaintiffs had specific, rigorous investment criteria that were strictly adhered to when RMBS purchases were considered and approved. In each instance, Plaintiffs, either directly or through their investment manager, relied on the representations in the Offering Documents, including the numerous misrepresentations described above, in connection with their decision to invest in the Certificates. But for the HSBC Defendants' misrepresentations concerning the underlying collateral and the rating of the Certificates, neither DZ Bank nor the HSH Plaintiffs would have purchased the Certificates. Similarly, had the Plaintiffs been aware of the lack of timely and valid assignments of the notes and mortgages to the Trusts, or that the Trusts would not qualify for REMIC classification, they would not have purchased the Certificates.

### A.     DZ Bank's Investment Criteria

196.     DZ Bank had strict RMBS investment requirements, necessitated by the fact that DZ Bank was pledging the securities purchased, including the Certificates, in order to satisfy the

Federal Reserve Bank's contingency liquidity requirements. Under the Federal Reserve Discount Window program, which was the primary pledge program used by DZ Bank, the Federal Reserve only permitted AAA rated RMBS to be pledged as collateral. During the period of Plaintiffs' investment in the Certificates, RMBS such as the ones issued and sold by Defendants were one of the very few types of securities that satisfied the Federal Reserve's requirements and provided a positive yield versus DZ Bank's own cost of funds.

197. In order to ensure that their RMBS purchases met the strict ratings and pledge requirements set by the Federal Reserve, DZ Bank applied a rigorous investment process that included multiple levels of review and approval. DZ Bank also maintained and followed an investment policy that focused on the attributes ultimately misrepresented by Defendants, including LTV/CLTV, owner-occupancy, and information that led to the faulty investment-grade ratings provided by the ratings agencies. In particular, each of DZ Bank's RMBS investments were required to have a "AAA" rating for purposes of collateral pledging at the Federal Reserve discount window. DZ Bank's other RMBS investments were required to have at least a "AA" rating. All of DZ Bank's RMBS investments were required to satisfy the limits imposed on LTV/CLTV ratios and owner-occupancy rates.

198. DZ Bank's investment criteria required that each of the Certificates receive at least a "AA" rating from at least two ratings agencies. However, because the ratings of the Certificates were based on the HSBC Defendants' misrepresentations concerning the loan pool and the purported transfer of the mortgages and notes to the Trust, the ratings for these Certificates were artificially inflated. The ratings given to the Trusts were only achieved because the HSBC Defendants deliberately misled the rating agencies concerning, among other things, the LTV and CLTV ratios, owner-occupancy rates and adherence to underwriting guidelines.

The Issuer Defendants knew through their due diligence (*see infra* Section III. C.) that the credit risk data they supplied to the ratings agencies was inaccurate. Had an accurate picture of the Loan Pools been supplied to the ratings agencies, the ratings agencies would not have given the Certificates the high ratings that they did. Thus, if the HSBC Defendants had accurately disclosed the LTV and CLTV ratios and owner-occupancy rates, and thus obtained accurate ratings for the Certificates, then Plaintiffs would not have invested in the Securitizations because they would not have met Plaintiffs' investment guidelines.

**B.    HSH Plaintiffs' Investment Criteria**

199.    The HSH Plaintiffs also had very strict investment guidelines that applied to their RMBS purchases. Specifically, in order to meet the HSH Plaintiffs' investment criteria, the weighted average CLTV ratio of the entire pool had to be lower than 85%. Further, under the HSH Plaintiffs' investment criteria no RMBS certificates could be purchased if there were any loans in the pool with a CLTV ratio of 100% or more. There were ***no exceptions*** to either of these requirements. There were also proportional limits for other CLTV thresholds in place to avoid pools that had been loaded with a few loans with very low CLTV ratios to create a distorted average. These limits were on a sliding scale depending on the credit rating of the certificate as shown in Table 11:

**Table 11**

| CLTV Criteria | AAA Certificates | AA / A Certificates |
|---|---|---|
| Weighted Average | Must be lower than 85% | Must be lower than 85% |
| Greater than or equal to 100% | None Allowed | None Allowed |
| Greater than or equal to 95% | Cannot exceed 15% | Cannot exceed 12% |
| Greater than or equal to 85% | Cannot exceed 40% | Cannot exceed 35% |

200. Based upon the statements made in the Offering Documents, the HSH Plaintiffs reasonably believed that each one of the Securitizations complied with the HSH Plaintiffs' investment criteria for CLTV ratios. In fact, *none* of the Securitizations met the requirements of the HSH Plaintiffs' strict investment guidelines because of the misrepresentations that Plaintiffs have since discovered.

### C. Plaintiffs' Reliance on the Offering Documents was Reasonable

201. Plaintiffs received the Offering Documents for each Securitization directly from the respective Underwriter Defendant, who solicited Plaintiffs to purchase such securities. The Underwriter Defendants specifically intended to solicit investments in the Securitizations from Plaintiffs. Plaintiffs reviewed the Offering Documents provided to them by the Underwriter Defendants. If the Securitization complied with Plaintiffs' investment criteria and policies based on such factors as the ratings and the quality and character of the underlying loan pool, including the LTV/CLTV ratios and owner-occupancy rates, then Plaintiffs would authorize the purchase of Certificates. Both Plaintiffs conducted at least two levels of review to verify that the Certificates satisfied their respective investment guidelines.

202. Throughout this investment approval process, Plaintiffs relied on the HSBC Defendants' representations and statements in the Offering Documents in performing their due diligence, and in determining whether the Securitization complied with their investment criteria. Plaintiffs also relied on the HSBC Defendants' representations and statements in the Offering Documents that the Trusts qualified for REMIC classification and that the Trusts would be pass-through entities, thereby avoiding double-taxation of the distributions paid to Plaintiffs. Had Plaintiffs been aware of the lack of timely and valid assignments of the notes and mortgages to the Trusts, or that the Trusts would not qualify for REMIC classification, they would not have purchased the Certificates.

203. Plaintiffs' reliance on the HSBC Defendants' representations in the Offering Documents was reasonable because Plaintiff's review and analysis could not uncover the fact that the representations of material fact were false. That is because the HSBC Defendants had sole access to the loan files for the loans purportedly to be pooled in the Securitizations. The loan files contained detailed information on each borrower, the borrower's credit application and the property securing the loan. This data was fundamental to verifying the accuracy of the data presented by the HSBC Defendants. It was, for example, used by Clayton for its due diligence of the loans. Only with such data, to which Plaintiffs did not have access, would Plaintiffs reasonably have been able to discover the HSBC Defendants' misrepresentations. Plaintiffs' review and analysis of the Securitizations was limited to the information, data, and representations supplied by the HSBC Defendants, which contained material misrepresentations and/or omissions.

204. As a representative of Moody's testified before Congress,

> [S]ubprime RMBS and their offshoots offer little transparency around the composition and characteristics of the underlying loan collateral. ***Potential investors are not privy to the information that would allow them to understand clearly the quality of the loan pool.*** Loan-by-loan data, the highest level of detail, is generally not available to investors.

*See* Fons, Jerome S., Statement to the House, Hearings before the Committee on Oversight and Government Reform: The State of the Credit Rating Industry, Oct. 22, 2008, at 2, available at http://oversight-archive.waxman.house.gov/documents/20081022102726.pdf, accessed June 14, 2012 (emphasis added). Only with such data, which was not available to Plaintiffs, would Plaintiffs reasonably have been able to discover the HSBC Defendants' misrepresentations.

205. But for the HSBC Defendants' misrepresentations, Plaintiffs would not have invested in the Certificates.

## XI.   PLAINTIFFS SUFFERED SIGNIFICANT
##        LOSSES DUE TO DEFENDANTS' MISCONDUCT

206.    Plaintiffs paid purchase prices for the Certificates far in excess of what the

Certificates were actually worth at the time of purchase.  Plaintiffs paid the prices they did based

on the false representations in the Offering Documents which represented that the Certificates

had a significantly lower credit risk than they actually had.  Once the true nature of the credit risk

materialized, the market values of the Certificates declined substantially.

207.    The Certificates received high investment grade ratings at issuance as a result of

the HSBC Defendants' misrepresentations concerning the credit risk of the underlying loan

pools.  Once the true nature of the credit risk materialized, the market values of the certificates

declined.  The Certificates have been downgraded to junk status.  Borrower defaults have since

skyrocketed.  Loss severity on defaulted mortgages has continued to rise as well.  Because of

failure to transfer the notes and mortgages into the Trusts, foreclosures related to loans in the

Trusts have become slower, more expensive, and more difficult—if even possible—to obtain.

All of this is a direct result of the poor quality of the underlying loans and the failure to transfer

the notes and mortgages to the Trusts, which was concealed from investors through the

misrepresentations in the Offering Documents.  The circumstances that the HSBC Defendants

misrepresented and/or failed to disclose impaired cash flow and thus caused a decline in the

market value of the Certificates from the inflated purchase prices paid by Plaintiffs, causing

damages to Plaintiffs in amounts to be determined at trial.

208.    Indeed, as a result of the matters that were misrepresented to or concealed from

Plaintiffs, the market value for the Certificates has declined precipitously.

209.    These declines in the market value of the Certificates were directly caused by the

circumstances that the HSBC Defendants had misrepresented or failed to disclose.  The

significantly lower-than-expected returns on the Certificates were a direct result of the misrepresentations and omissions in the Offering Documents because those misrepresentations and omissions concealed the poor quality of the underlying loans. The lower credit quality of the underlying loans made defaults more likely to occur, resulting in decreased cash flow to the Trusts. Furthermore, the HSBC Defendants' failure to transfer the notes and mortgages to the Trusts converted the Certificates from those Trusts into unsecured securities, thereby subjecting investors such as Plaintiffs to increased credit risk. Moreover, as RMBS market participants reassessed the risks and potential adverse consequences resulting from the failure to transfer notes and lower-than-reported credit quality of the underlying mortgages loans—whether for RMBS in general or the particular Certificates purchased by Plaintiffs—the market value of the Certificates declined.

### FIRST CAUSE OF ACTION

**Common Law Fraud**
**(Against the HSBC Defendants)**

210.    Plaintiffs repeat and re-allege the allegations above as if fully set forth herein.

211.    The HSBC Defendants issued and sold the Certificates pursuant to the Offering Documents, and are responsible for the representations contained therein.

212.    The Offering Documents contained numerous misrepresentations, as fully set forth above, including with respect to LTV ratios, owner-occupancy rates, the adherence to underwriting guidelines regarding the loan pools underlying all Trusts, the risk profiles reflected in the high ratings assigned to the Certificates, the assignment of the underlying notes and mortgages to the Trusts, and REMIC classification for the Trusts.

213.    These misrepresentations were material to Plaintiffs in their decisions to invest in the Certificates.

214. The HSBC Defendants were aware that the misrepresentations were false and misleading based on their due diligence of the loans underlying the Trusts and their responsibility to timely transfer such loans to the trust, or were recklessly indifferent to the truth of the representations in the Offering Documents concerning the credit quality and transfer of the loans.

215. The Issuer Defendants prepared the Offering Documents under the dominion and control of the Parent Defendants for their respective Trusts, and the statements therein are therefore attributable to them. The Issuer Defendants prepared the Offering Documents for their respective Trusts with the intention that Plaintiffs would rely on them in deciding whether or not to invest in the Trusts.

216. The Underwriter Defendant reviewed the Offering Documents for all Trusts and, knowing of their falsity, delivered them to Plaintiffs to solicit Plaintiffs' investment in the Trusts. Because the Underwriter Defendant provided Plaintiffs with information the Underwriter Defendant knew to be false, the Underwriter Defendant adopted those statements, intending for Plaintiffs to rely on them.

217. Plaintiffs, either directly or through their investment managers, reviewed Offering Documents for the Trusts, and reasonably relied on the misrepresentations therein in determining to purchase the Certificates. Plaintiffs would not have purchased the Certificates but for those misrepresentations.

218. Plaintiffs have suffered substantial losses as a direct result of the the HSBC Defendants' misrepresentations in the Offering Documents, and are therefore entitled to relief.

## SECOND CAUSE OF ACTION

### Fraudulent Concealment
### (Against the HSBC Defendants)

219.    Plaintiffs repeat and re-allege the allegations above as if fully set forth herein.

220.    The HSBC Defendants marketed the Certificates to Plaintiffs pursuant to the Offering Documents.

221.    Prior to the securitization of each of the loan pools into the Trusts, the HSBC Defendants received detailed loan files containing material information concerning the credit quality of the loans.  Specifically, the loan files contain the underlying documentation that the borrowers submitted in connection with their loan applications, together with additional information, such as appraisals and credit assessments.  Plaintiffs did not have access to the loan files or the information contained therein.

222.    Moreover, prior to the securitization of each of the loan pools into the Trusts, the HSBC Defendants conducted due diligence on the loans underlying the Trusts.  This due diligence provided the HSBC Defendants with additional material information regarding the loans and mortgages underlying the sale of the Certificates, such as the existence of interim second liens, and adherence to underwriting guidelines.  Furthermore, the HSBC Defendants were cognizant of the fact that the information they were providing to the rating agencies in connection with the rating of the Certificates did not accurately depict the credit risk of the underlying loan pools (together with the additional facts set forth in paragraphs 221-222, the "Concealed Material Facts").

223.    Plaintiffs did not have access to, and were not aware of, the Concealed Material Facts at the time Plaintiffs purchased the Certificates.

224. The HSBC Defendants' particular knowledge of the Concealed Material Facts was superior to that of Plaintiffs. The HSBC Defendants were aware that Plaintiffs lacked access to the Concealed Material Facts and were relying on the HSBC Defendants' statements in the Offering Documents. Because of this superior knowledge, the HSBC Defendants had a duty to disclose the Concealed Material Facts to Plaintiffs.

225. The HSBC Defendants did not disclose the Concealed Material Facts to Plaintiffs, but rather intentionally hid them from Plaintiffs and other investors in order to make the investments appear safer than they actually were.

226. Plaintiffs could not have detected the Concealed Material Facts through the exercise of ordinary due diligence.

227. Had the Concealed Material Facts been disclosed to Plaintiffs, Plaintiffs would not have purchased the Certificates.

228. Plaintiffs have suffered significant losses as a direct result of the HSBC Defendants' fraudulent concealment of the Concealed Material Facts from Plaintiffs, and are therefore entitled to relief.

## THIRD CAUSE OF ACTION

### Negligent Misrepresentation
### (In the Alternative, Against the HSBC Defendants)

229. Plaintiffs repeat and re-allege the allegations above as if fully set forth herein.

230. The HSBC Defendants owed Plaintiffs a duty of care with respect to the accuracy of the information that they provided to Plaintiffs in the Offering Documents in order to solicit investment in the Certificates because of their superior (and exclusive) knowledge concerning the loan underwriting.

231. The HSBC Defendants had superior knowledge concerning the credit quality of the loans that were included in their Trusts. Plaintiffs did not have access to the loan files containing the documents and information necessary to assess the veracity of the loan documents or the creditworthiness of the borrowers.

232. The HSBC Defendants, however, had access to all the loan files for the loans that they included in the Trusts. The HSBC Defendants knew, therefore, that the Plaintiffs were relying on the HSBC Defendants' statements in the Offering Documents and the due diligence performed by the HSBC Defendants to determine the accuracy of the credit characteristics of the loans, because Plaintiffs had no way of verifying the information for themselves and had to rely instead on the information in the Offering Documents. Plaintiffs also had no way of verifying that the mortgages and notes were being properly assigned and transferred to the Trusts; this information too was peculiarly within the HSBC Defendants' control, since they were the ones charged with making those assignments.

233. Recently, based on information and documents not available to Plaintiffs when they purchased the Certificates, Plaintiffs have discovered that many of the representations in the Offering Documents concerning the credit quality of the loans and the ratings assigned to the Certificates were false.

234. There is substantial evidence that the HSBC Defendants knew the falsity of these representations at the time they were made in the Offering Documents. However, if the HSBC Defendants did not know of the falsity of their representations, their failure to know was the result of their own negligence in failing to conduct proper due diligence on the loans prior to securitization.

235.    As a result of the undisclosed poor quality of the loans, and the rating downgrades reflecting what the Certificates would have been rated absent the HSBC Defendants' misrepresentations, the value of the Certificates has decreased and Plaintiffs have suffered substantial losses.

## FOURTH CAUSE OF ACTION

### Aiding and Abetting Fraud
### (Against HSBC Securities and the Parent Defendants)

236.    Plaintiffs repeat and re-allege the allegations above as if fully set forth herein.

237.    In addition to its own fraud, HSBC Securities also played an essential role in the Issuer Defendants' fraud because HSBC Securities delivered the Offering Documents prepared by the Issuer Defendants that contained the false statements.

238.    Moreover, HSBC Securities had actual knowledge that the statements in the Offering Documents concerning the credit quality of the underlying loans for all Trusts, and the timely transfer of notes and mortgages for the Trusts were false.  HSBC Securities' actual knowledge of the fraud is directly inferable from its substantial involvement in the securitization process, and the fact that at least one senior manager of HASC was also a senior manager of HSBC Securities. (*See supra* Section II.A.)

239.    HSBC Securities was aware that the notes and mortgages were not timely assigned to the Trusts, and that the practices of the Issuer Defendants was to not assign notes and mortgages to the Trusts.  HSBC Securities reviewed the Offering Documents prior to sending them to Plaintiff DZ Bank.

240.    HSBC Securities therefore knowingly provided substantial assistance to the Issuer Defendants' fraud, and HSBC Securities is liable for aiding and abetting that fraud.

241. The actions of HSBC Securities in aiding and abetting the fraud proximately caused injury to Plaintiff DZ Bank.

## FIFTH CAUSE OF ACTION

### Rescission Based Upon Mutual Mistake
### (Against Blaylock, and Against HSBC Securities in the Alternative)

242. Plaintiffs repeat and re-allege the allegations above as if fully set forth herein.

243. As set forth above, there is ample evidence to suggest that HSBC Securities was aware of the misrepresentations in the Offering Documents and substantially assisted in their preparation and distribution. Alternatively, however, if HSBC Securities did not know that the mortgages and notes were not timely assigned to the Trusts, then the parties' mutual mistake as to these essential facts upon which the sale of the Certificates was predicated entitles Plaintiff DZ Bank to rescission of the sale. Moreover, because Blaylock, as the underwriter and counterparty to the HSH Plaintiffs' purchase of Certificates, did not know that the mortgages and notes were not timely assigned to the Trusts, the HSH Plaintiffs are entitled to rescission of the sale of their Certificates as well.

244. The transfer of the mortgages and notes to the Trusts was a particularly crucial fact that went to the heart of each of the Trusts. Without proper assignments, the trustee for the Trusts has no legal right to foreclose on the collateral in the event a borrower defaults, and the Trusts do not qualify for REMIC classification. Further, without proper and timely assignments, the Trusts bear a substantial risk of being subjected to heavy tax assessments and penalties which are ultimately borne by investors such as Plaintiffs. If there was a mistake as to this essential term, there could have been no meeting of the minds.

245. These were significant risks that were undisclosed due to the misrepresentations in the Offering Documents, and were contrary to Plaintiffs' investment objectives, and

contradicted the Underwriter Defendants' purported investment offers. Had Plaintiffs known that the mortgages and notes had not been properly assigned to the Trusts, they would not have purchased the Certificates.

246.    In entering into a contract for the purchase and sale of interest in the RMBS trusts at issue, Plaintiffs and the Underwriter Defendants each intended the contracts to provide for an investment in trusts that actually owned residential mortgages and underlying promissory notes at the time of investment, and to a material extent the Trusts did not.

247.    Plaintiffs acted promptly to seek rescission upon discovering this mistake.

248.    Therefore, if the Underwriter Defendants were unaware of the misrepresentations in the Offering Documents regarding the transfer of the notes and mortgages when they sold the Certificates to Plaintiffs, then a mutual mistake of a material fact existed at the time of the contract, and the transactions are void.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(a)    An award in favor of the HSH Plaintiffs for rescission against Blaylock;

(b)    An award in favor of the HSH Plaintiffs against the HSBC Defendants except HSBC Securities, and an award in favor of DZ Bank against all HSBC Defendants, jointly and severally, for all damages sustained as a result of the HSBC Defendants' wrongdoing and negligence in an amount to be proven at trial, including:

(a)    Rescission and/or rescissory damages for recovery of the consideration paid for the Certificates;

(b)  Alternatively, Plaintiffs' damages caused by the HSBC Defendants' fraud, including any diminution in value of the Certificates, as well as lost principal and lost interest payments thereon, and other consequential damages;

(c)  Punitive damages on Plaintiffs' fraud-based claims;

(d)  Prejudgment interest;

(e)  Reasonable costs and expenses incurred in this action, including attorneys' and experts' fees and costs; and

(f)  Any such other relief the Court may deem just and proper.

Dated:  New York, New York
September 17, 2012

LABATON SUCHAROW LLP

By:

Joel H. Bernstein
jbernstein@labaton.com

Mark S. Arisohn
marisohn@labaton.com

Martis Alex
malex@labaton.com

Corban S. Rhodes
crhodes@labaton.com

140 Broadway
New York, New York 10005
(212) 907-0700

*Attorneys for Plaintiffs*