UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEUTSCHE ZENTRAL-GENOSSENCHAFTSBANK AG, NEW YORK BRANCH, d/b/a DZ BANK AG, NEW YORK BRANCH; HSH NORDBANK AG; HSH NORDBANK AG, LUXEMBOURG BRANCH; HSH NORDBANK AG, NEW YORK BRANCH; and HSH NORDBANK SECURITIES S.A., <br><br> Plaintiffs, <br><br> -against- <br><br> HSBC NORTH AMERICA HOLDINGS, INC.; HSBC USA INC.; HSBC MARKETS (USA) INC.; HSBC BANK USA, N.A.; HSI ASSET SECURITIZATION CORPORATION; HSBC SECURITIES (USA) INC.; BLAYLOCK & COMPANY INC.; and BLAYLOCK ROBERT VAN LLC, <br><br> Defendants. | Civil Action No. 12-cv-4025-VM <br><br> Oral Argument Requested |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .........................................................................................1

STATEMENT OF FACTS ...............................................................................................2

   A. The Structure of RMBS Transactions.................................................................2

   B. The Offering Materials Disclosed That Some Loans Were Originated Based on
       "Underwriting Exceptions" .............................................................................3

   C. Procedural History ...........................................................................................4

ARGUMENT ..................................................................................................................4

   I. ALL OF PLAINTIFFS' CLAIMS ARE TIME-BARRED ........................................4

      A. HSH Bank's Claims are Barred by the German Statute of Limitations ............5

      B. DZ Bank's Claims are Barred by the German Statute of Limitations ...............9

   II. PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE MISREPRESENTATION
       REGARDING THE TIMELY TRANSFER OF LOAN FILES ...........................16

   III. PLAINTIFFS' FRAUD CLAIMS MUST BE DISMISSED FOR FAILURE
       TO PLEAD SCIENTER ..................................................................................18

   IV. PLAINTIFFS' CLAIMS OF NEGLIGENT MISREPRESENTATION AND
       FRAUDULENT CONCEALMENT MUST BE DISMISSED FOR FAILURE
       TO ALLEGE A "SPECIAL RELATIONSHIP" ...............................................22

   V. PLAINTIFFS FAIL TO STATE A CLAIM FOR MUTUAL MISTAKE ...........24

CONCLUSION...............................................................................................................25

## TABLE OF AUTHORITIES

CASES                                                                                    Page(s)

*Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292 (S.D.N.Y. 2009)  ............. 18

*Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC*, 74 A.D.3d 652,
    905 N.Y.S.2d 152 (1st Dep't 2010) ................................................................... 23

*Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164 (C.D. Cal. 2011) ................. 8

*Asset Mgmt. & Capital Co., Inc. v. Nugent*, 85 A.D.3d 947,
    925 N.Y.S.2d 653 (2d Dep't 2011) ........................................................................ 24

*ATSI Comms. Inc. v. Shaar Fund, Ltd.*, 693 F.3d 87 (2d Cir. 2007) ........................................... 20

*Baena v. Woori*, 05-cv-7018, 2006 WL 293572 (S.D.N.Y. Oct. 11, 2006) ................................. 10

*Ballow Brastead O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235 (2d Cir. 2006) ........................ 24

*Bank of Am. v. 57-63 Wadsworth Terrace Holding, LLC*, Index No. 601439/2009,
    2009 WL 3794352 (N.Y. Sup. Ct. Nov. 2, 2009) .................................................... 17

*Bank Hapoalim B.M. v. Bank of America Corp.*, 12-cv-4316, 12-cv-4317,
    2012 WL 6814194 (C.D. Cal. Dec. 21, 2012) ................................................. 16, 18

*Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*,
    692 F.3d 42 (2d Cir. 2012) ..................................................................................... 11

*Da Silva v. Musso*, 53 N.Y.2d 543 (N.Y. 1981) ......................................................................... 24

*Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 12-cv-4761,
    2013 WL 856499 (S.D.N.Y. Feb. 27, 2013) ........................................................... 23

*ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383 (S.D.N.Y. 1999) ............... 25

*Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012) ......... 7, 23

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) ......................... 20, 22

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*,
    862 F. Supp. 2d 322 (S.D.N.Y. 2012) ..................................................................... 7

*Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186 (S.D.N.Y. 1986) ................................ 18

*Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525 (N.Y. 1999) ................................................ 10

*Gordon & Co. v. Ross*, 63 F. Supp. 2d 405 (S.D.N.Y. 1999) .................................................... 10

*HSH Nordbank, AG v. UBS AG, et al.*, 95 A.D.3d 185 (1st Dep't 2012)................................. 6, 23

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010) .................................. 16

*J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144 (N.Y. 2007) ................................. 22

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ................................................ 4

*Landesbank Baden Wurttemberg v. Goldman Sachs & Co.*, 821 F. Supp. 2d 616
   (S.D.N.Y. 2011), *aff'd* 478 Fed. App'x 679 (2d Cir. 2012) ................................. 22

*Lang v. Paine, Webber, Jackson & Curtis, Inc.*, 582 F. Supp. 1421 (S.D.N.Y. 1984)................ 10

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) ........................................21-22

*Lewis v. Rosenfeld*, 138 F. Supp. 2d 466 (S.D.N.Y. 2001)............................................................ 5

*Maalouf v. Salomon Smith Barney, Inc.*, 02-cv-4770, 2003 WL 1858153
   (S.D.N.Y. Apr. 10, 2003)........................................................................................22-23

*MBIA Ins. Co. v. GMAC Mortg. LLC*, 30 Misc. 3d 856 (N.Y. Sup. Ct. 2010)........................... 23

*MLSMK Inv. Co. v. JPMorgan Chase & Co.*, 737 F. Supp. 2d 137 (S.D.N.Y. 2010).................. 18

*Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 96 A.D.3d 646 (1st Dep't 2012)................ 10

*R & A Food Servs., Inc. v. Halmar Equities, Inc.*, 717 N.Y.S.2d 642 (2d Dep't 2000) ..........24-25

*Robb Evans & Assocs. L.L.C. v. Sun Am. Life Ins.*, 10-cv-5999,
   2012 WL 488257 (S.D.N.Y. Feb. 14, 2012)..................................................... 10, 13

*Robb Evans & Assocs. L.L.C. v. Sun Am. Life Ins.*, 10-cv-5999,
   2013 WL 123727 (S.D.N.Y. Jan. 8, 2013) ............................................................. 11

*SEC v. U.S. Envt'l, Inc.*, 82 F. Supp. 2d 237 (S.D.N.Y. 2000)................................................... 19

*Segal v. Gordon*, 457 F.2d 602 (2d Cir. 1972) ....................................................................17-18

*Simkin v. Blank*, 19 N.Y.3d 46 (N.Y. 2012) ............................................................................. 24

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 00-cv-8058, 2004 WL 2072536
   (S.D.N.Y. Sept. 14, 2004), *aff'd*, 148 F. App'x 66 (2d Cir. 2005) ......................... 18

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
   802 F. Supp. 2d 1125 (C.D. Cal. 2011) ............................................................. 5, 14

*Stichting Pensioenfonds ABP v. Credit Suisse Group AG*,
   Index No. 653665/2011 (N.Y. Sup. Ct. Nov. 30, 2012) .................................... 11, 13

*Stonebridge Capital, LLC v. Nomura Int'l PLC*, 68 A.D.3d 546 (1st Dep't 2009).....................24

*Stuart v. American Cyanamid Co.*, 158 F.3d 622 (2d Cir. 1998) ....................................5

*Union Central Life Ins. Co., et al. v. Credit Suisse Securities (USA), LLC, et al.*,
   11-cv-02327, 2013 WL 1342529 (S.D.N.Y. Mar. 29, 2013)............................................20, 22

*Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304 (S.D.N.Y. 2011) ...........................19

*Verizon Directories Corp. v. Continuum Health Partners, Inc.*,
   74 A.D.3d 416 (1st Dep't 2010) ...............................................................13

*Woori Bank v. Merrill Lynch*, 12-cv-3993,
   2013 WL 449912 (S.D.N.Y. Feb. 6, 2013)...................................................10, 22

*Zutty v. Rye Select Broad Mkt. Prime Fund, L.P.*, Index No. 113209/2009,
   2011 WL 5962804 (N.Y. Sup. Ct. Apr. 15, 2011)...............................................18

## STATUTES

N.Y. C.P.L.R. § 202............................................................................5, 9

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 8(a) ...........................................................1

Federal Rule of Civil Procedure 9(b).......................................................passim

Federal Rule of Civil Procedure 12(b)(6) ......................................................1

Federal Rule of Evidence 201(b)(2) ...........................................................4

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **Accredited Home:** | Accredited Home Lenders, Inc. |
| **AVM:** | Automated valuation model |
| **Certificates:** | The RMBS certificates that Plaintiffs allege to have purchased and on which Plaintiffs have filed this lawsuit |
| **Complaint or Compl.:** | Consolidated Complaint, attached as Exhibit A to the supporting Moon Decl. |
| **Countrywide:** | Countrywide Home Loans, Inc. |
| **Decision One:** | Decision One Mortgage Company, LLC |
| **Defendants:** | HSBC Defendants and Blaylock Robert Van LLC |
| **Dep. Tr.:** | Deposition Transcript of Carl Amendola, DZ Bank AG's 30(b)(6) |
| **DZ Bank:** | Plaintiff Deutsche Zentral-Genossenschaftsbank AG |
| **Ex.:** | Exhibit |
| **FCIC:** | Financial Crisis Inquiry Commission |
| **HSBC Defendants:** | Defendants HSBC North America Holdings Inc., HSBC USA Inc., HSBC Markets (USA) Inc., HSBC Bank USA, N.A., HSI Asset Securitization Corporation, and HSBC Securities (USA) Inc. |
| **HSH Bank:** | Plaintiffs HSH Nordbank AG; HSH Nordbank AG, Luxembourg Branch; HSH Nordbank AG, New York Branch; and HSH Nordbank Securities S.A. |
| **LTV:** | Loan-to-value |
| **Moon Decl.:** | The Declaration of William J. Moon in Support of Defendants' Motion to Dismiss, dated April 24, 2013 |
| **Nedden Decl.:** | The Declaration of Jan Heiner Nedden in Support of Defendants' Motion to Dismiss, dated April 24, 2013 |
| **Offering Materials:** | Offering documents accompanying the Securitizations at issue, including the Prospectuses, Prospectus Supplements, and Pooling and Servicing Agreements |
| **Option One:** | Option One Mortgage Corporation |
| **Plaintiffs:** | Plaintiffs Deutsche Zentral-Genossenschaftsbank AG; Plaintiffs HSH Nordbank AG; HSH Nordbank AG, Luxembourg Branch; HSH Nordbank AG, New York Branch; and HSH Nordbank Securities S.A. |
| **PSA:** | Pooling and Servicing Agreement |

-v-

**RMBS:**   Residential mortgage-backed securities

**Securitizations:**   The RMBS offerings at issue in this Action from which Plaintiffs allegedly purchased Certificates, namely:

| | |
|---|---|
| HASC 2006-OPT1 | HASC 2007-HE1 |
| HASC 2006-OPT2 | HASC 2006-HE2 |
| HASC 2006-OPT3 | HASC 2006-WMC1 |
| HASC 2006-HE1 | |

**WMC:**   WMC Mortgage Corp.

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Complaint (attached as Moon Decl. Ex. A) pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

DZ Bank and HSH Bank are sophisticated investors which, in 2006 and 2007, purchased RMBS sponsored by defendant HSBC Bank USA in the hopes of realizing a substantial profit. By 2007, however, public reports indicated that the housing market had turned. By 2008, it was common knowledge that the market had collapsed. News articles and public reports tracking this collapse, many of which are cited in the Complaint, describe misconduct by each and every one of the originators who underwrote loans supporting the Certificates that Plaintiffs purchased. In 2008, the Massachusetts Attorney General filed a lawsuit against one of the originators (Option One) alleging unfair and deceptive origination of mortgage loans and widespread departure from underwriting guidelines. Also in 2008, all three credit ratings agencies downgraded Certificates held by DZ Bank and HSH Bank to junk status.

Plaintiffs filed this lawsuit years later, in 2012. For a number of reasons, Plaintiffs' claims should be dismissed with prejudice. *First*, Plaintiffs' claims are untimely under Germany's three-year statute of limitations, which applies under the New York borrowing statute. Plaintiffs allege that the Offering Materials misrepresented (i) originators' abidance with underwriting guidelines, (ii) LTV ratios, (iii) owner-occupancy rates, and (iv) when loan files would be transferred to the trust. Plaintiffs' allegations are supported by news articles, public reports, and other data available to Plaintiffs in or before 2008, rendering the filing of this lawsuit in 2012 untimely.

---

[1] Blaylock & Company Inc. is named as a defendant but has not been served and has not appeared.

*Second*, the alleged misrepresentation regarding whether the loan files would be timely transferred to the trust is not actionable, since the Offering Materials (specifically, the PSA) effectuated that transfer at the time of the closing.  The RMBS at issue in this case was, at all times, in fact backed by residential mortgages.

*Third*, Plaintiffs' scienter allegations are not specific to the securitizations at issue in this case and their appeal to certain public documents is misguided.  Contrary to Plaintiffs' allegations, these documents do not support the inference that any HSBC Defendant "waived in" to the Securitizations loans that it knew had not been originated in accordance with originators' guidelines.  For these and other reasons, as explained more fully below, the Complaint should be dismissed in its entirety, with prejudice.

## STATEMENT OF FACTS

The facts, as derived from the Complaint, can be briefly stated.[2]  From January 2006 through March 2007, DZ Bank and HSH Bank collectively purchased over $163 million in RMBS from Defendants. (Compl. ¶¶ 1, 43.)

### A.           The Structure of RMBS Transactions

An RMBS is an asset-backed security collateralized by a pool of underlying mortgages or notes on residential property.  (Compl. ¶ 44.)  Investors in RMBS are entitled to the flow of income generated by payments made by borrowers on the underlying loans.  (*Id.*)  The process of creating RMBS begins with the origination of the underlying loans (typically loans for purchase, refinance or home equity lines of credit) by an "originator."  (*Id.* ¶ 45.)  The originator then sells a pool of mortgages to a "sponsor" that is in the business of packaging RMBS.  (*Id.*)  The

---

[2] For purposes of this Motion, the Complaint's allegations must be accepted as true.  Defendants vigorously dispute many these allegations, and will disprove them at the appropriate time.

-2-

sponsor transfers the pool of loans to a "depositor," which deposits the loans into a trust.  (*Id.*) The trust holds the beneficial ownership interest in the loans and issues "certificates"—backed by the underlying loan pool—that can be sold to investors.  (*See, e.g.*, Moon Decl. Ex. B, at 1.) Finally, an "underwriter" sells the certificates to investors.  (Compl. ¶ 52.)  The certificate holders assume the risk that the borrowers of the underlying loans make the principal and interest payments owed to the trust.  If those payments are made, the certificate holders make a profit on their investment.  (*See id.* ¶ 51.)

To satisfy investors' varying risk tolerances, securitization trusts generally issue several different "classes" or "tranches" of certificates.  (Compl. ¶ 51.)  Subordinate certificates, like the ones at issue here, bear higher interest rates but are less protected against delinquencies and defaults.  (*See id.*)

### B. The Offering Materials Disclosed That Some Loans Were Originated Based on "Underwriting Exceptions"

In connection with their purchases of the Certificates, Plaintiffs received prospectuses and prospectus supplements that disclosed the nature of the underlying mortgages and their attendant risks.  These documents represented that some of the loans did not comply with all of the applicable guidelines but were nevertheless included in the pools due to compensating factors.  For example, one prospectus supplement from 2006 disclosed (i) that "A Substantial Number of the Mortgage Loans Were Originated Based on Underwriting Exceptions"; and (ii) that because of these exceptions, "the mortgage loans in the mortgage pool are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional

manner." (Moon Decl. Ex. C, at S-23.)[3]  The prospectus supplement to HASC 2007-HE1 further warned that "housing prices and appraisal values in many states have declined."  (Moon Decl. Ex. D, at S-16.)

### C.        Procedural History

Five years after the purchase of the last Certificate at issue, Plaintiffs filed two separate actions in the Supreme Court of New York, New York County, on January 31, 2012, and February 27, 2012, respectively.  Plaintiffs bring claims for common law fraud (Count One), fraudulent concealment (Count Two), negligent misrepresentation (Count Three), aiding and abetting fraud (Count Four), and rescission based on mutual mistake (Count Five).

Defendants removed both cases to this Court on May 21, 2012.  Consistent with the Court's Individual Rules of Practice, Defendants sent Plaintiffs a letter identifying deficiencies in the Complaint.  (*See* Moon Decl. Ex. E, at 1 ("this letter sets forth various pleading deficiencies in the existing complaint . . . so as to provide Plaintiffs an opportunity to amend it").)  Defendants reiterated their position concerning Plaintiffs' deficient allegations in a January 4, 2013 Joint Status Report filed with this Court, and noted that "Plaintiffs indicated that they will not amend the Complaint to cure these deficiencies."  (*See* Moon Decl. Ex. F, at 5.)  Accordingly, Defendants move to dismiss the Complaint with prejudice.

## ARGUMENT

## I.      ALL OF PLAINTIFFS' CLAIMS ARE TIME-BARRED

A federal court sitting in diversity applies the laws of the forum in which it sits—here, New York.  The New York "borrowing statute" requires non-resident plaintiffs to abide by the

---

[3] This Court may take judicial notice of documents incorporated in the Complaint, "relevant public disclosure documents required to be filed with the SEC," and any other "'sources whose accuracy cannot reasonably be questioned.'"  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (quoting Fed. R. Evid. 201(b)(2)).

shorter of the statute of limitations of New York and the jurisdiction where the cause of action

accrued.  N.Y. C.P.L.R. § 202; *see also Stuart v. American Cyanamid Co.*, 158 F.3d 622, 627 (2d

Cir. 1998).

The claims set forth in the Complaint are untimely and must be dismissed with prejudice.

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1140 (C.D. Cal.

2011) (holding plaintiff had notice of potential claims against Countrywide by February 14,

2008, because of public reports about the questionable quality of the loans Countrywide was

underwriting and the fact that Countrywide took a charge against earnings and was sued in 2007

in connection with these reports).  We address each Plaintiff's claims separately.

### A.        HSH Bank's Claims are Barred by the German Statute of Limitations.

HSH Bank concedes that the New York borrowing statute applies to its claims, and that

the statute requires that its claims be timely under the German statute of limitations.  (Moon

Decl. Ex. G.)

Under German law, the statute of limitations for all claims asserted in the Complaint is

three years.  (Nedden Decl. ¶ 21.)  This three-year period begins to run at the end of the calendar

year in which (i) the claim arose and (ii) the claimant obtained knowledge of the circumstances

of the claim and of the identity of the obligor, or would have obtained such knowledge but for its

own gross negligence.[4]  (*Id.* at ¶ 23.)  Under German law, "it is not necessary for the plaintiff to

have knowledge of every fact that might ultimately be alleged;" rather, the limitations period is

triggered "if the plaintiff has knowledge of facts that would be sufficient to state a claim."  (*Id.* at

¶ 26.)  The three-year limitations period may be triggered even before a plaintiff is "absolutely

---

[4] German law defines what "inquiry notice" standard this Court must apply.  *Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 474 (S.D.N.Y. 2001).

certain about the misconduct of the defendant . . . ."  (*Id.* at ¶ 27.)  A plaintiff has a duty to consult sources of information accessible to them, including newspaper articles.  (*Id.* at ¶ 29.) The duty to investigate may be triggered by "poor economic performance of an investment fund."  (*Id.* at ¶ 30.)  "[A] heightened duty to investigate" applies to "sophisticated plaintiffs" since "the obligation to stay abreast of information is higher if the plaintiff by profession works with information that reflects or influences his claims."[5]  (*Id.* at ¶ 31.)

HSH Bank's claims arise from its February 2006 purchase of seven certificates issued in connection with a single securitization involving a single originator—Option One.  HSH Bank alleges that the Offering Materials contained misrepresentations regarding the quality of the collateral originated by Option One, and the timing of the transfer of the loan files.  Such claims plainly "arose" under German law at the time of purchase, in 2006.  (Nedden Decl. at ¶ 23.)

It is equally clear that HSH Bank "obtained knowledge of the circumstances of the claim[s]" in 2008, or could have but for its own gross negligence.  (Nedden Decl. at ¶ 40.)  *First*, HSH Bank supports its central allegation—that Option One abandoned its guidelines—by reference to a lawsuit containing identical allegations filed *in 2008*.  As alleged:

> "Option One has been identified through multiple reports and investigations for its substantial underwriting failures.  **On June 3, 2008**, for instance, the Attorney General of the Commonwealth of Massachusetts filed an action against Option One, [for its] unfair and deceptive origination and servicing of mortgage loans . . . [S]ince 2004, Option One '**increasingly disregarded underwriting standards** . . . and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay . . . .
>
> "The Massachusetts Attorney General alleged that Option One's agents and

---

[5] There can be no dispute that DZ Bank and HSH Bank are both sophisticated entities subject to the "heightened duty to investigate."  This is demonstrated by the size of their balance sheets and extensive activity in capital markets.  (Moon Decl. Exs. H, at 9, 44-45, and I, at 41, 112-13.)  The First Department recently described HSH Bank as "a sophisticated commercial entity."  *HSH Nordbank, AG v. UBS AG, et al.*, 95 A.D.3d 185, 188 (1st Dep't 2012).

brokers frequently overstated an applicant's income and/or ability to pay, and **inflated the appraised value** of the applicant's home . . . .

"**On November 24, 2008**, the Superior Court of Massachusetts granted a preliminary injunction that prevented Option One from foreclosing on thousands of its loans issued to Massachusetts residents."

(Compl. ¶¶ 116–18 (emphasis added).)

*Second*, HSH Bank admits in its Complaint that the "the true nature of the credit risk materialized" when the "values of the certificates declined" and they were "downgraded to junk status." (*Id.* ¶ 207.) These events happened in 2008. By the end of 2008, nearly all of the Certificates had lost more than 50 percent of their face value, "creat[ing] a duty of the investor to consult a lawyer." (Nedden Decl. ¶ 30.) In November 2008, Fitch downgraded three of the seven certificates purchased by HSH Bank *to junk status*.[6] (Moon Decl. Ex. J, at 1, 16-21.) This Court has held that a downgrade to junk status is "an important event" that puts an RMBS investor on notice of potential claims. *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 321 (S.D.N.Y. 2012) (applying federal standard for inquiry notice). As one would expect of any sophisticated entity heavily invested in RMBS, HSH Bank monitored downgrades (including, specifically, downgrades by Fitch) and recognized that they could support legal claims.[7] Indeed, in 2008, HSH Bank filed a lawsuit against UBS alleging that it had "procured ratings that overstated the true credit quality of the Notes," and supported the allegations by

---

[6] The remaining four certificates were issued in connection with the same securitization and were collateralized by the very same mortgages underlying the Certificates that were downgraded to junk status. (Moon Decl. Ex. K, at S-5.) Three were themselves downgraded in 2008. (Moon Decl. Ex. J, at 1, 16-21.) Thus, Fitch's downgrade to junk status of the three related Certificates put HSH Bank on notice as to issues with the collateral underlying all of its Certificates. *See Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 338 (S.D.N.Y. 2012) ("[B]ased on the payment structure of the offering, a drop in value of one tranche affected the value of all the tranches.").

[7] In mid-2008, HSH Bank observed that "[t]he US mortgage market is still under stress due to rising delinquencies and declining house prices in key regions" and warned that "[r]atings downgrade risk remains." (Moon Decl. Ex. L, at 20.)

reference to "downgrade[s] by Fitch."  (Moon. Decl. Ex. M, at ¶¶ 55, 76 (Amended Complaint in *HSH Nordbank AG v. UBS AG and UBS Securities LLC*, Index No. 600562/08 (Sup. Ct. N.Y. Dec. 10, 2008).)  HSH Bank's admission that "the true nature of the credit risk materialized" when the "values of the certificates declined" and they were "downgraded to junk status," (Compl. ¶¶ 206, 207), is fatal, since those events occurred in 2008.

*Third*, HSH Bank supported the Complaint in substantial part with "a review of loan-level data" that was available to HSH Bank in or before 2008.  HSH Bank conducted one "review" to support its allegation that the Offering Materials understated LTV ratios due to inflated appraisals.  This review was based on a mathematical model, or AVM, that estimates home values based on basic information regarding properties.  (*See* Compl. ¶ 78.)  Nothing prevented HSH Bank from running this AVM in 2008 (or, for that matter, back in 2006, when it purchased the Certificates).  HSH Bank conducted a second "review" to support its allegation that the Offering Materials overstated owner-occupancy rates.  This review is based on credit reports that identify "the borrower's mailing address six months after the origination of the mortgage."  (*Id.* ¶ 93.)  These files were also available in 2008.  *See Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1180–81 (C.D. Cal. 2011) (dismissing federal securities fraud claims as time barred where a "reasonable investor could and should have [run an AVM] well before 2008").

*Fourth*, HSH Bank supports its allegations that the Offering Materials misrepresented when the loans would be transferred to the trust by reference to assignments and satisfactions that HSH Bank concedes, in the Complaint, were "publicly-recorded."  (*Id.* ¶ 139.)  Of the 57 assignments and satisfactions that Plaintiffs attach to the Complaint in Appendix B, more than half (37) date to, and were publicly recorded in, 2008.  Notably, HSH Bank supports its scienter

allegations in substantial part by reference to these documents.

Under German law, a sophisticated bank heavily invested in RMBS such as HSH Bank is subject to a "heightened duty to investigate" its claims.  It is not permitted to delay the commencement of the limitations period by "closing [its] eyes."  (Nedden Decl. ¶ 28.)  The entire "investigation" that HSH Bank conducted before bringing this lawsuit and that it describes in the Complaint—(i) reviewing press articles, public reports, downgrades, and investment performance; (ii) running an AVM; (iii) checking credit files to determine where borrowers lived six months from origination; and (iv) collecting "publicly-recorded" mortgage documents—could and should have been conducted in 2008.[8]  That is when the global financial crisis hit.  That is when Certificates were downgraded to below investment grade.  That is when the Massachusetts Attorney General sued Option One for disregarding guidelines.  That is when, by HSH Bank's admission, the "true nature of the credit risk materialized."

HSH Bank "obtained knowledge of the circumstances of its claims" in 2008, or "would have obtained such knowledge but for its own gross negligence."  (Nedden Decl. ¶ 25, ¶ 28.)  The three-year limitations period began to run on December 31, 2008 and expired three years later.  (*Id.*)  HSH Bank's claims, filed on February 27, 2012, are time-barred.

### B.      DZ Bank's Claims are Barred by the German Statute of Limitations

### 1.      The German Statute of Limitations Applies to DZ Bank's Claims

Unlike HSH Bank, DZ Bank asserts that its claims accrued in New York, so neither C.P.L.R. § 202 nor the German statute of limitations applies.  This assertion is incorrect, and DZ

---

[8] Looking beyond the face of the Complaint, a flood of news from 2007 and 2008 suggested issues with origination practices across the industry and specifically at Option One.  In July 2007, Moody's announced that "subprime mortgage loans securitized in 2006"—the vintage of HSH Bank's purchases—"have delinquency rates that are higher than original expectations," and were "originated in an environment of aggressive underwriting."  (Moon Decl. Ex. N, at 1.)  By late 2007, there were public reports indicating that Option One's "[l]oan quality standards plunged."  (Moon Decl. Ex. O, at 5); *see also* Nedden Decl. ¶ 37; Ex. 2 (collecting German press).

Bank's attempt to wriggle out from under the New York borrowing statute is unavailing.

Under the New York borrowing statute, tort and contract claims are deemed to "accrue[] at the time and in the place of the injury." *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (N.Y. 1999) (tort); *Woori Bank v. Merrill Lynch*, 12-cv-3993, 2013 WL 449912, at *3 (S.D.N.Y. Feb. 6, 2013) (rescission and negligent misrepresentation). "When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Global Fin.*, 93 N.Y.2d at 529*; see also Gordon & Co. v. Ross*, 63 F. Supp. 2d 405, 408 (S.D.N.Y. 1999). Where the plaintiff is a corporation, this is either "the state of incorporation or its principal place of business." *See Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 96 A.D.3d 646, 651 (1st Dep't 2012) (citing *Global Fin.,* 93 N.Y.2d at 529–30).

DZ Bank does not dispute that it is incorporated in Germany and maintains its principal place of business there. (Compl. ¶ 26; Moon Decl. Ex. P, at 3.) This ends the inquiry. As this Court recently held, "Under the New York borrowing statute, a business's principal place of business constitutes the *sole* residency of that business entity." *Woori Bank*, 2013 WL 449912, at *3 (citing *Robb Evans & Assocs. L.L.C. v. Sun Am. Life Ins.*, 10-cv-5999, 2012 WL 488257, at *3 (S.D.N.Y. Feb. 14, 2012)) (emphasis added).

DZ Bank can be expected to argue that although its principal place of business is in Germany, the borrowing statute does not apply under the so-called *Lang* exception. *See Lang v. Paine, Webber, Jackson & Curtis, Inc.*, 582 F. Supp. 1421, 1425 (S.D.N.Y. 1984) (borrowing statute did not apply to an individual plaintiff who maintained a "separate financial base" in New York). This argument is severely misplaced; the law is clear that the *Lang* exception is "extremely rare" and has no application here. *Robb Evans*, 2012 WL 488257, at *4 (quoting *Baena v. Woori*, 05-cv-7018, 2006 WL 293572, at *6 (S.D.N.Y. Oct. 11, 2006)).

-10-

To Defendants' knowledge, the *Lang* exception has never been applied to a foreign corporation.  *See Robb Evans & Assocs. L.L.C. v. Sun Am. Life Ins.*, 10-cv-5999, 2013 WL 123727, at *1 (S.D.N.Y. Jan. 8, 2013) ("Unsurprisingly, the Receiver has not identified a case in which a court has applied the limited *Lang* exception to hold that a corporate entity's claims accrued outside of its principal place of business.").  A New York court recently held the *Lang* exception did *not* apply where a foreign corporation had filed suit over RMBS purchases made in New York.  *See Stichting Pensioenfonds ABP v. Credit Suisse Group AG*, Index No. 653665/2011, slip op. at *5 (N.Y. Sup. Ct. Nov. 30, 2012) ("To extend the separate financial base exception to a foreign institution conducting financial business in New York without any showing of actually unusual circumstances would allow the exception to swallow the rule and render New York's borrowing statute toothless.")(Moon Decl. Ex. Q.)

Moreover, here, jurisdictional discovery made clear that DZ Bank does not operate "a separate financial base" in New York.[9]  REDACTED PURSUANT TO PROTECTIVE ORDER

---

[9] Discovery was limited to the issue of whether DZ Bank is subject to the German statute of limitations under the New York "borrowing statute."  Discovery did *not* extend to whether DZ Bank was aware of the circumstances surrounding its claims in 2008 or would have been but for gross negligence. This, however, is evident from the face of the Complaint and other public materials.

[10]              REDACTED PURSUANT TO PROTECTIVE ORDER

REDACTED PURSUANT TO PROTECTIVE ORDER

Plainly, DZ Bank felt the alleged injury in Germany, at its principal place of business, and not in New York.  It does not maintain a separate financial base here.  The simple fact that it maintains operations in New York is insufficient to trigger *Lang*.  *See Stichting Pensioenfonds ABP v. Credit Suisse Group AG*, slip op. at *4-5 (rejecting *Lang* even though Plaintiff "purchased all of the Certificates at issue in the United States, with U.S. dollars drawn from U.S. bank accounts, and held them in custodian accounts in New York, managed by an investment advisor . . . with a primary place of business in New York")(Moon Decl. Ex. Q); *see also Verizon Directories Corp. v. Continuum Health Partners, Inc.*, 74 A.D.3d 416, 417 (1st Dep't 2010) (rejecting *Lang* notwithstanding that plaintiff was authorized to do business in New York and "asserted extensive presence here"); *Robb Evans*, 2012 WL 488257, at *3.  Accordingly, like HSH Bank's claims, DZ Bank's claims must meet the statute of limitations of DZ Bank's home country, Germany.

### 2.      The German Statute of Limitations Bars DZ Bank's Claims

DZ Bank's claims relate to its purchases of Certificates issued in connection with seven different securitizations.  The originators of the underlying loan pools were Option One, Countrywide, Accredited Home, Decision One and WMC.  DZ Bank cannot dispute that its claims "arose" under German law at the time of the purchases, which occurred in 2006 and early 2007.  (*See* Nedden Decl. at ¶ 23.)  Nor can DZ Bank seriously dispute that it had "knowledge of the circumstances of its claims" by 2008.  (*Id.* ¶¶ 36-38, ¶ 40.)

All of the information available to HSH Bank in 2008—including (i) the Massachusetts AG complaint regarding Option One, (ii) credit downgrade and performance information, (iii) the data Plaintiffs used to perform "reviews" of LTV ratios and owner-occupancy rates, and (iv) publicly recorded assignments and satisfactions—was similarly available to DZ Bank.  In

-13-

addition, DZ Bank describes in the Complaint numerous articles or public reports that provided it with notice, in 2007 or 2008, of issues with each of the remaining four originators at issue in DZ Bank's claims:

Countrywide: "**A March 11, 2008** Wall Street Journal article stated that federal investigators found that 'Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients.'"[13]  (Compl. ¶ 134 (emphasis added).)

Accredited Home: **In 2008**, a federal court in California denied a motion to dismiss a lawsuit against Accredited where the complaint "contains the allegations of several confidential witnesses who detail pervasive, widespread exceptions to the Company's underwriting policies and substantial pressures to approve such loans . . . ."  (Compl. ¶ 121 (emphasis added).)

Decision One: **In 2007**, Decision One was "accused by borrowers of intentionally relying on out-of-town appraisers to inflate the values of homes," and Decision One "ceased operations in September 2007."   (Compl. ¶¶ 126, 127 (emphasis added).)

WMC: "**On June 4, 2008**, the Washington State Department of Financial Institutions, Division of Consumer Services entered a 'Statement of Charges' . . . related to WMC's alleged deceptive and unfair practices, disclosure failures, and use of an unregistered mortgage broker."[14]  (Compl. ¶ 129 (emphasis added).)

Rating agency actions in 2007 and 2008 provided DZ Bank with additional notice of its claims, as well as facts that it could have used to state them.  On July 10, 2007, Moody's singled out WMC for "performing below the average of the 2006 vintage" and downgraded hundreds of

---

[13] *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1138-39, 1140 (C.D. Cal. 2011) (finding inquiry notice of Countrywide's underwriting practices by at least February 2008).

[14] Other public reports (properly considered on a motion to dismiss) similarly detailed problems with these same originators.  (*See, e.g.*, Moon Decl. Ex. W (Peter Coy, *WMC underwrote some of the crappiest subprime loans*, Bus. Wk. (Feb. 21, 2008)); (*see also* Nedden Decl. ¶ 37; Ex. 2 (collecting German press).)

RMBS certificates (including lower-rated tranches of Securitizations at issue here) due to

"aggressive underwriting."  (Moon Decl. Ex. N, at 1.)  By the end of 2008, ratings agencies had

downgraded all of DZ Bank's Certificates.  Three (of seven) had been downgraded to junk status

*by all three major ratings agencies*.[15]  DZ Bank was fully aware of these downgrades in 2008: it

wrote down $2.0 billion for expected losses that year and warned investors that further write-

downs could follow.  (*See* Moon Decl. Ex. X (*DZ Bank Joins List of German Victims of U.S.*

*Subprime Crisis*, The N.Y. Times (Dec. 8, 2008), at 1 ("DZ warned that write-downs worse than

the $2.0 billion could follow because of rating agency downgrades on investments and a

deterioration in the market for this kind of debt at the start of this year.").)

DZ Bank, a sophisticated entity subject to a heightened duty to investigate under German

law, "obtained knowledge of the circumstances of the claims," or "would have obtained such

knowledge but for their own gross negligence," in 2008.  (*See* Nedden Decl. ¶ 25, ¶ 41.)  Like

HSH Bank, DZ Bank waited until 2012 to file these claims, rendering them untimely.

## II. PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE MISREPRESENTATION REGARDING THE TIMELY TRANSFER OF LOAN FILES

In support of their fraud and negligent misrepresentation claims (Counts One, Two, Three

and Four), Plaintiffs allege that the Offering Materials contained material, false representations

regarding whether the loans were transferred to the trust in a timely fashion.  (Compl. ¶¶ 139,

142, 182–85.)  To determine whether such a misstatement was made in the Offering Materials,

---

[15] The "A3" tranche of HASC 2006-WMC1 and the "M2" tranche of HASC 2006-HE1 were both downgraded to junk status by Standard & Poor's on April 7, 2008; by Moody's, on October 28, 2008; and by Fitch, on November 24, 2008 (*See* Moon Decl. Ex. J, at 10-13.)  The "2A3" tranche of HASC 2006-HE2 was downgraded to junk status even earlier—on February 14, 2008 (Fitch), April 17, 2008 (Standard & Poor's), and April 21, 2008 (Moody's) (*See* Moon Decl. Ex. J, at 4-5.)

the Court must consider the entire document, including documents incorporated by reference therein.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365–66 (2d Cir. 2010).

Plaintiffs' allegation is erroneous and contradicted by clear, unambiguous language in the Offering Materials.  The Pooling and Servicing Agreements (or PSAs) assign and transfer the mortgages and notes to the respective trusts, and govern payments made to holders of certificates.  Section 2.01(a) of each relevant PSA explicitly provides: "The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders . . . all the right, title, and interest of the Depositor in and to the Trust Fund".  (*E.g.*, Moon Decl. Ex. Y, at 52).) The term "Trust Fund" is defined as "[t]he corpus of the trust created hereunder consisting of (i) the Mortgage Loans and all interest and principal with respect thereto received on or after the related Cut-off Date . . . ."  (*E.g., id.* at 50.)  This language unequivocally effectuated an assignment of all rights to the underlying mortgages, to the trustee, at the time of closing.

The very thing that Plaintiffs allege Defendants failed to do—transfer the loans to the trust in a timely fashion—was in fact accomplished by the PSA at the appropriate time.  Thus, Plaintiffs' argument has been "repeatedly rejected."  *Bank Hapoalim B.M. v. Bank of America Corp.*, 12-cv-4316, 12-cv-4317, 2012 WL 6814194, at *8 (C.D. Cal. Dec. 21, 2012) (under New York law, concluding that allegations that loans were not timely transferred to the trusts do not "comprise actionable misrepresentations" and are "false as a matter of law, since the PSA itself properly transferred the loans to the trusts.").  To the extent the PSA was breached, an investors' remedy "is to sue the trusts for breach of contract and breach of fiduciary duties."  *Id.*

Plaintiffs attach to the Complaint a selection of publicly-recorded satisfactions and assignments.  (Compl., at App. B.)  These documents merely reflect the mechanics of

transferring and recording loan files and satisfactions, which the Offering Materials contemplated might occur in the future.  Most of the satisfactions demonstrate merely that MERS (and not the trust) served as the record owner of the mortgage, as was expressly contemplated in the Offering Materials.  (*See, e.g.*, Moon Decl. Ex. Z, at 47 ("MERS shall serve as the mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans . . . .").).  The assignments reflect a date of *recordation*, not a date of assignment, and the Offering Materials contemplated recordation could occur after assignment.[16]  Regardless, these satisfactions or assignments do not alter the fact that the PSA unambiguously transferred beneficial ownership of the loans to the trusts.

Further, Plaintiffs have failed to allege, as they must, any cognizable loss.  Plaintiffs allege that the trust "*may* be prevented from foreclosing" on a property; they do not allege that the trust was so prevented.  (Compl. ¶ 164 (emphasis added).)  Plaintiffs allege that there are "potential adverse consequences" arising from the alleged misrepresentations, and that the trusts "bear a substantial risk" of being subjected to taxes and penalties.  (*Id.* ¶ 209.)  They do not allege that there *were* any adverse consequences or that any of the "substantial risks" materialized.  Indeed, they do not even allege that a trust failed to receive a single borrower payment owed to that trust.  Plaintiffs' general and hypothetical allegations regarding loss are insufficient to state a claim.  *Cf. Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 00-cv-8058, 2004

---

[16] *See, e.g.*, Moon Decl. Ex. Z, at 48 ("The related prospectus supplement *may* specify that the depositor or another party will be required to promptly cause the assignment of each related mortgage loan . . . (except for those held under the MERS(R) system) to be recorded in the appropriate public office for real property records.").  Prompt recording is not legally required to effect an assignment.  *Bank of Am. v. 57-63 Wadsworth Terrace Holding, LLC*, Index No. 601439/2009, 2009 WL 3794352, at *2 (N.Y. Sup. Ct. Nov. 2, 2009) (for an assignment to be valid, the assignor must merely "manifest an intention to transfer the right to another person").

WL 2072536, at *9 n.17 (S.D.N.Y. Sept. 14, 2004) ("Plaintiff has not shown that it suffered any injury in connection with the REMIC classification of the Trust, which has not been disturbed by the IRS."), *aff'd*, 148 F. App'x 66 (2d Cir. 2005); *see also Bank Hapoalim*, 2012 WL 6814194, at *8 ("allegations of title transfer fraud fail to plead injury" because they rely on "entirely speculative potential future harm").

### III.     PLAINTIFFS' FRAUD CLAIMS MUST BE DISMISSED FOR FAILURE TO PLEAD SCIENTER.

The heightened pleading requirements of Fed. R. Civ. P. 9(b) apply to Plaintiffs' fraud claims (Counts One, Two and Four) and require that the Plaintiffs state "with particularity the circumstances constituting fraud or mistake." *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 319 (S.D.N.Y. 2009) (quoting *Frota v. Prudential-Bache Sec., Inc.,* 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986)).  "General allegations" of fraud are insufficient to survive a motion to dismiss "no matter how frequently repeated."  *Segal v. Gordon*, 457 F.2d 602, 607 (2d Cir. 1972).  Rather, a plaintiff must allege with particularity facts that show that defendants knew their statements about material facts were false and that they had "an actual intent to deceive, manipulate, or defraud." *Zutty v. Rye Select Broad Mkt. Prime Fund, L.P.*, Index No. 113209/2009, 2011 WL 5962804, at *11 (N.Y. Sup. Ct. Apr. 15, 2011).  Bald allegations that plead fraud by hindsight are insufficient, as are allegations that do no more than describe the existence of "red flags" or the possibility that defendants could have stopped another entity's fraud.  *Id.* at *12 (quoting *MLSMK Inv. Co. v. JPMorgan Chase & Co.*, 737 F. Supp. 2d 137, 144 (S.D.N.Y. 2010)).  Plaintiffs' scienter allegations fail for a number of reasons.

*First*, Plaintiffs purport to plead scienter in substantial part based on allegations that the HSBC Defendants had an "ongoing practice . . . to not transfer mortgages into the RMBS trusts

that they securitized" and, thus, "it is apparent that the HSBC Defendants knowingly engaged in a continuing and deliberate practice of not effectuating transfers of notes and mortgages to RMBS trusts that they created, marketed and sold." (*See, e.g.*, Compl. ¶ 167.) This bald allegation, unsupported by particularized facts and directly contradicted by the PSAs, is insufficient to plead scienter.

*Second*, Plaintiffs fail to allege scienter with particularity as to specific Defendants. Plaintiffs allege that "substantial overlap in management" among entities means that scienter allegations regarding one entity apply to all. (Compl. ¶ 169.) Such group pleading fails to satisfy Rule 9(b)'s requirement of specificity. *See Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) ("[T]he mere existence of a parent-subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate. Instead, plaintiffs must demonstrate that the parent or affiliate possessed some degree of control over, or awareness about, the fraud."); *SEC v. U.S. Envt'l, Inc.*, 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000) ("[P]laintiff must satisfy Rule 9(b) as to each individual defendant, and cannot do so by making vague allegations about the defendants as a unit.").

*Third*, Plaintiffs allege that one of the originators at issue, Decision One, was a wholly-owned subsidiary of non-defendant HSBC Holdings, and that the HSBC Defendants "therefore had full and unfettered access to documents" of Decision One. (Compl. ¶ 108.) One cannot simply assume, however, that the HSBC Defendants had "unfettered" access to their affiliate's books. Further, Plaintiffs fail to allege that the HSBC Defendants *did* access those books and thereby obtain the kind of knowledge that would give rise to scienter.

*Fourth*, and finally, Plaintiffs purport to allege scienter by reference to the "Clayton Report," but in so doing they entirely misrepresent what that report states. (*See* Compl. ¶¶ 97–

107.)  On this motion to dismiss, the Court may consider the Clayton Report and the FCIC

investigation record—incorporated by reference into the Complaint (*see, e.g.*, Compl. ¶ 98)—in

assessing Plaintiffs' allegations.  *See ATSI Comms. Inc. v. Shaar Fund, Ltd.*, 693 F.3d 87, 99 (2d

Cir. 2007) (courts "may consider any written instrument attached to the complaint, statements or

documents incorporated into the complaint by reference"); *see also Union Central Life Ins. Co.,

et al. v. Credit Suisse Securities (USA), LLC, et al.*, 11-cv-02327, 2013 WL 1342529, at *7

(S.D.N.Y. Mar. 29, 2013) (examining Clayton Trending Report).  The Court does not accept as

true on a motion to dismiss "unwarranted deductions of fact."  *First Nationwide Bank v. Gelt

Funding Corp.,* 27 F.3d 763, 771 (2d Cir. 1994) (citation and internal quotation marks omitted).

To begin, Plaintiffs allege that the Clayton Report states that the HSBC Defendants

"waived in" non-conforming loans to the specific "Securitizations" at issue here.  (Compl. ¶

103.)  This is incorrect.  The Clayton Report does not indicate whether its work for the HSBC

Defendants relates to loans underlying Plaintiffs' Certificates.  (*See* Moon Decl. Ex. AA, at 6.)

At most, the Clayton Report supports only generalized allegations about RMBS, and not

allegations specific to the Securitizations.  For this reason (among others that apply equally here)

Judge Daniels recently rejected the argument that the Clayton Report is a sufficient basis to

allege scienter.  *Union Central*, 2013 WL 1342529, at *7 ("Plaintiffs do not allege that Clayton

necessarily did diligence on any of the loans underlying the securitizations at issue in this case or

provided information with respect to those loans to Defendants.").

Moreover, the Clayton Report does not state that the HSBC Defendants waived in to any

pool a loan that did not comply with applicable origination guidelines.  All that the Clayton

Report states is that HSBC "waived in" to pools certain loans that Clayton, in performing due

diligence for HSBC, had initially marked as an event-level "3."  Plaintiffs allege, erroneously,

that Clayton scored a loan a "3" if that loan "both failed to comply with the originator's underwriting guidelines and failed to possess any compensating factors." (Compl. ¶ 100.) This critical allegation is unsubstantiated and wrong: The Clayton Report does not explain why a loan might be scored a "3," and the FCIC record squarely indicates that there are other reasons for that score. Vicki Beal, a Senior Vice President in Transaction Management at Clayton, testified that "[e]xceptions must be reviewed in conjunction with the corresponding underwriting guidelines *and client tolerances*." (*See* Moon Decl. Ex. BB, at 157 (emphasis added).) Ms. Beal "said that as originators' lending guidelines were declining, she saw the securitizing firms introduce additional credit guidelines. . . *with stricter guidelines, one would expect more rejections, and, after the securitizer looks more closely at the rejected loans, possibly more waivers.*" (Moon Decl., Ex. CC, at 166-67 (emphasis added).[17] Clayton's CEO thus wrote to the FCIC Chairman that the Clayton Report could be "misleading to the public" and that "because of the variation in client processes, scopes and tolerances, we believe that the Commission should not draw any conclusions from the [Clayton Report]." (*See* Moon Decl. Ex. DD, at 3.)

In short, the Clayton Report does not permit the inference that HSBC waived into any pool a loan that failed to comply with an originators' applicable guidelines. The loans "waived in" to RMBS pools could have been fully compliant with originator guidelines. Plaintiffs' allegations to the contrary (*see* Compl. ¶¶ 100-107) must be disregarded. *See Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 174-75 (2d Cir. 2005) ("unwarranted deductions of fact" are

---

[17] For example, a securitizer might have required that Clayton score a loan a "3" if it failed to meet an especially stringent net disposable income test, even if such loan had otherwise been underwritten in accordance with the originator's applicable guidelines. Such a loan file would then be subjected to further review and, thereafter, possibly "waived in" to the pool. This more stringent due diligence process results in both a higher number of "3s," and a higher "waive-in" rate for reasons other than whether an originator abided by its guidelines. Furthermore, even if a loan had been initially scored a "3" because it failed the originator's guidelines (as opposed to the securitizer's requirements), it might be permissibly waived in to the pool if, upon further review, it was determined that it did comply with the originator's guidelines.

not admitted on a motion to dismiss); *see also Gelt Funding*, 27 F.3d at 771 (the principle that

"unwarranted deductions of fact are not admitted . . . applies with even greater force in a fraud

case governed by the more stringent pleading requirements").

Plaintiffs' scienter allegations are plainly insufficient and dismissal of the fraud claims

(Counts One, Two and Four) is warranted.  Furthermore, Plaintiffs cannot have it both ways: to

the extent the scienter allegations *are* sufficient, then they would have been sufficient in 2008

and thus Plaintiffs' claims are time barred.  The only scienter allegations not available to

Plaintiffs in 2008 relate to the Clayton Report, but that report permits no meaningful inference of

scienter.  *See, e.g.*, *Union Central*, 2013 WL 1342529, at *7 ("the Clayton Trending Report . . .

do[es] not compel an inference that Defendants knew, as Plaintiffs allege, that the originators had

'completely abandoned their underwriting standards.'"); *Woori Bank*, 2013 WL 449912, at *5–6

(the "FCIC Report was not the talismanic 'open sesame' command to unlock the courthouse

doors"); *Landesbank Baden Wurttemberg v. Goldman Sachs & Co.*, 821 F. Supp. 2d 616, 622-23

(S.D.N.Y. 2011) (dismissing common law fraud claims because plaintiffs' generalized

allegations concerning defendants' due diligence and Clayton Report findings are insufficient to

satisfy heightened pleading standard for fraud), *aff'd* 478 Fed. App'x 679 (2d Cir. 2012).

## IV.        PLAINTIFFS' CLAIMS OF NEGLIGENT MISREPRESENTATION AND FRAUDULENT CONCEALMENT MUST BE DISMISSED FOR FAILURE TO ALLEGE A "SPECIAL RELATIONSHIP"

To successfully plead claims of fraudulent concealment (Count Two) and negligent

misrepresentation (Count Three), Plaintiffs must allege "the existence of a special or privity-like

relationship imposing a duty on the defendant to impart correct information to the plaintiff . . . ."

*J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (N.Y. 2007).  Such allegations must

meet the heightened pleading requirements of Fed. R. Civ. P. 9(b).  *See, e.g.*, *Maalouf v.*

*Salomon Smith Barney, Inc.*, 02-cv-4770, 2003 WL 1858153, at *4 (S.D.N.Y. Apr. 10, 2003).

The transactions at issue here were negotiated at arm's length by sophisticated institutions and do not give rise to the type of duty that can support a claim for negligent misrepresentation or fraudulent concealment.  Courts "regularly hold as a matter of law that an arm's length business arrangement between sophisticated and experienced parties cannot give rise to a 'special relationship.'"  *Fed. Hous. Fin. Agency*, 858 F. Supp. 2d at 334 (citing *Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC*, 74 A.D.3d 652, 905 N.Y.S.2d 152 (1st Dep't 2010)).

Plaintiffs do not allege that a special relationship existed (the words "special relationship" do not appear in the Complaint) nor do they allege that Defendants possessed unique or specialized expertise that, if proven, would give rise to such a duty.  *Fed. Hous. Fin. Agency,* 858 F. Supp. 2d at 225 ("the fact that, with regard to the [RMBS] at issue in this case, the defendants had greater knowledge of the underlying loan files and the practices of third-party due diligence providers is not sufficient to establish a 'special relationship'"); *MBIA Ins. Co. v. GMAC Mortg. LLC*, 30 Misc. 3d 856, 865 (N.Y. Sup. Ct. 2010) ("[m]ere possession of the loan files . . . does not create the type of specialized knowledge" that would give rise to a special relationship).[18]

HSH Bank recently had comparable negligent misrepresentation and fraudulent concealment claims dismissed in state court.  *HSH Nordbank*, 95 A.D.3d at 208 (holding that "UBS was not acting as HSH's 'financial or investment advisor'" and therefore "[a]s a matter of law . . . HSH cannot allege that it had a 'special relationship' with UBS upon which a negligent

---

[18] *But see Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 12-cv-4761, 2013 WL 856499, at *10 (S.D.N.Y. Feb. 27, 2013).  In *Dexia*, this Court allowed Plaintiffs' negligent misrepresentation claim to proceed to discovery along with its fraud claims.  The fraud claims in *Dexia*, unlike those here, are supported by particularized allegations, including "various public reports, testimony before governmental bodies, and statements by confidential witnesses" specifically addressing intentional bad acts of defendants in that action.  *Id.* at *3, *10.

misrepresentation claim may be predicted").  For the same reasons, Plaintiffs' claims warrant

dismissal here.

**V.          PLAINTIFFS FAIL TO STATE A CLAIM FOR MUTUAL MISTAKE**

Claims of mutual mistake (Count Five), which require courts to rescind a contract, are

strongly disfavored and plaintiffs face a heavy burden, even at the pleading stage, to overcome

this presumption.  *See Simkin v. Blank*, 19 N.Y.3d 46, 52 (N.Y. 2012); *see also Stonebridge*

*Capital, LLC v. Nomura Int'l PLC,* 68 A.D.3d 546, 548 (1st Dep't 2009) (noting a "strong

presumption against mutual mistake claims").  The mistake must be "so material that . . . it goes

to the foundation of the agreement." *Simkin*, 19 N.Y.3d at 52 (quoting *Da Silva v. Musso*, 53

N.Y.2d 543, 552 (N.Y. 1981)); *see also Asset Mgmt. & Capital Co., Inc. v. Nugent*, 85 A.D.3d

947, 948, 925 N.Y.S.2d 653, 654–55 (2d Dep't 2011) (holding that the alleged mutual mistake

must exist at the time the Contract is entered into and must be material, involving "a fundamental

assumption of the contract").  Plaintiffs fail to meet this extraordinary burden.

The mutual mistake claim is time barred since it is based on publicly-recorded

satisfactions and assignments that date to 2008.  But assuming *arguendo* that it is not time

barred, it must nevertheless be dismissed because the allegations do not establish that any

mistake ever existed.  Plaintiffs allege that the parties were "mistaken" in their belief that the

loans would be timely transferred to the respective trusts.  For reasons already discussed, there

was no mistake about this.  The PSAs transferred the loans to the trust at the appropriate time.

Plaintiffs' claims for rescission must also fail because they were not filed "promptly" and

"without unreasonable delay."  *Ballow Brastead O'Brien & Rusin P.C.* v. *Logan*, 435 F.3d 235,

240 (2d Cir. 2006); *see also R & A Food Servs., Inc.* v. *Halmar Equities, Inc.*, 717 N.Y.S.2d 642,

643 (2d Dep't 2000) (plaintiff "failed to promptly seek rescission after learning of the alleged

fraud" because it "waited more than one year before commencing this action, and failed to take

any other action to rescind the lease").  A party cannot "elect to continue with the contract,

continue to receive benefits from it, and thereafter bring an action for rescission or total breach."

*ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 392 (S.D.N.Y. 1999).

Plaintiffs waited four years to file this lawsuit while they collected payments associated with the

Certificates.  This extraordinary delay warrants dismissal of the mutual mistake claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the

claims asserted against them in the Complaint in their entirety, with prejudice.

Dated:     New York, New York       Respectfully Submitted,
            April 24, 2013


By: _____       By: _____

Kenneth Murray               Damien J. Marshall, Esq.
BEUGELMANS, PLLC         Andrew Z. Michaelson, Esq.
80 Broad Street, Suite 1302     Jaime Sneider, Esq.
New York, NY 10004         BOIES, SCHILLER & FLEXNER LLP
Phone: (646) 350-0050        575 Lexington Avenue
Facsimile: (646) 304-6897      New York, NY 10022
Email: kmurray@beugelmans.com   Phone: (212) 446-2300
                       Facsimile: (212) 446-2350
*Attorney for Blaylock Robert Van, LLC*  Email: dmarshall@bsfllp.com
                       Email: amichaelson@bsfllp.com

                       Edward J. Normand
                       BOIES, SCHILLER & FLEXNER LLP
                       333 Main Street
                       Armonk, NY 10504
                       Phone: (914) 749-8200
                       Facsimile: (914) 749-8300
                       Email: enormand@bsfllp.com

                       Mark G. Hanchet
                       Michael O. Ware
                       MAYER BROWN LLP
                       1675 Broadway
                       New York, NY 10019-5820
                       Phone: (212) 506-2500
                       Facsimile: (212) 262-1910
                       Email: mhanchet@mayerbrown.com
                       Email: mware@mayerbrown.com

                       *Attorneys for HSBC Defendants*